EDGERLY & a., Ex'rs, *v.* BARKER & a.

A devise to "children" may express an intent to include the issue of children who die after the execution of the will.

In a devise to trustees for the support of the testator's children during their lives, remainder to his grandchildren (born and unborn) when the youngest arrives at the age of forty years, the last nineteen of the forty years are too remote, being beyond the limit prescribed by the rule against perpetuities. The secondary intent, that the grandchildren shall not have the remainder until the youngest is forty years old, is modified by the primary intent that they shall have it, and the implied intent that the will shall take effect as far as possible. The remainder vests in them when the youngest is twenty-one.

IN EQUITY. Bill of interpleader, brought by the executors of Hiram Barker against Clara Barker, Hiram H. Barker, and the trustees appointed by the eighth clause of the will. The testator, a widower, left two children, Clara and Hiram H. The amount of the estate is believed to be more than $600,000. The present annual income, over and above taxes and insurance, is about $20,-000. Hiram H. claims that the eighth clause, devising the residue to trustees, is invalid, and that the residue belongs to Clara and himself. The prayer of the bill is, that Clara, Hiram H., and the trustees be ordered to interplead concerning their rights and

powers under the will, and to state their respective claims; that the title of the residue be determined; and that the plaintiffs be instructed and directed as to their duties in the premises.  The answer of Hiram H. admits the facts alleged in the bill, and prays judgment as to the validity of the residuary clause.  The answer of the trustees admits the same facts, and asserts the validity of the residuary clause.

## [Copy of the Will.]

Be it known that I, Hiram Barker of Farmington, in the County of Strafford and State of New Hampshire, do make and publish this my last will and testament in manner following:—

First—I give and bequeath to Fannie S. Cooper, daughter of Gilman Cooper of Wolfeboro, in the County of Carroll in said State, the sum of three thousand dollars.

Second—I also give and bequeath to Martha E. Hayes, daughter of Reuben Hayes, Junior, late of Madbury, in said County of Strafford, the sum of two thousand dollars.

Third—I also give and bequeath to Frank P. Barker, son of Eleazor D. Barker of said Wolfeboro, the sum of three thousand dollars.

Fourth—I also give and bequeath to Charles Hayes, son of Elihu Hayes of New Durham, in said County of Strafford, the sum of two thousand dollars.

Fifth—I also give and bequeath to the First Congregational Society in said Farmington, the sum of one thousand dollars, to be kept as a fund, the interest of which shall alone be used and then only in support of preaching in their meeting-house—the present brick or other edifice as may be—in said Farmington.

Sixth—I also give and bequeath to the First Freewill Baptist Society in said Farmington, the sum of one thousand dollars, to be kept as a fund, the interest of which shall alone be used and then only for the support of preaching in their meeting-house—the present or other edifice as may be—in said Farmington.

Seventh—I give and bequeath unto my daughter, Clara Barker, one hundred shares of Rock Island Railroad stock.

Which said several legacies or sums of money and stock I will and order to be paid in one year after my death.

Eighth—I give, bequeath and devise all the rest, residue and remainder of my estate, real, personal or mixed of every name, nature and description, and wherever found or situate, to James B. Edgerly and John F. Cloutman, both of said Farmington, Nathaniel Stevens of Alton in the County of Belknap, in said State, Henry R. Parker and Reuben G. Hayes, both of Dover in said County of Strafford, and their successors and their heirs in trust for the following purposes to wit:—

First—To carry on, manage and improve all my real estate to the best advantage, and take care of my personal estate; and invest

the proceeds of all my said estate, with power to sell at private or public sale any of my real estate, whenever in the best judgment of said trustees it is most expedient and for the interest of my estate so to do, and make the money received from such sale, or sales, a part of said investment.

Secondly—To pay out of and from the net income of my said estate to my daughter, Clara Barker, during her life yearly, the sum of two thousand dollars in such sums and at such times as she shall request; and if said sum is not sufficient for her ample and comfortable support, and suitable manner of living, such further and additional sums of money shall be paid her by said trustees and their successors as shall in their best judgment be just, sufficient and proper for such purposes.

Thirdly—To pay out of and from said net income of my estate to my son, Hiram H. Barker, during his life yearly, the sum of one thousand dollars in such manner and at such times as he shall request for the proper and reasonable support of himself and his wife and children, if, in the best opinion of said trustees, he shall, from his habits and mode of life, prove himself to be safe and competent to have the use and expenditure of said money for said purposes; and if said sum of one thousand dollars shall not in the best judgment of said trustees, or their successors, prove sufficient for said purposes, then said specified sum shall be increased to such an amount as shall in their best opinion be sufficient for said objects, and said trustees, in case my said son shall prove incapable or unfit from any cause to manage and pay out said money for said purposes, then my said trustees shall manage and expend the same money and more, if need be, all at their best judgment, and all for said purposes; that, also, out of said income of my said estate means shall be furnished and provided for the education at home, or abroad, at proper institutions of learning, of each and all of said children; and any other child or children of my said son, if any, hereafter born, shall have and receive all the rights and benefits from my estate that such child, or children, would have if living at my decease. And I hope that said children, each and all, will avail themselves of this opportunity to acquire a good education.

And if my said son shall become and remain temperate, sober and correct in his habits for the entire space of five years together, he shall have five thousand dollars and be added to the number of the trustees and be of equal power with any other one of them in the control and management of my estate; and he shall be of said trustees, after becoming such as aforesaid, so long as he shall remain temperate, sober and correct in his habits, and no longer, and ten thousand dollars more shall, at the expiration of ten years from and after the expiration of said five years, be paid him if he shall remain during all said last named time perfectly temperate and of good and regular habits; and fifteen thousand dollars more

shall be paid to him at the expiration of ten years more after the end of said last mentioned ten years if he shall remain during all said last named ten years perfectly temperate and of good and regular habits.

Fourthly—To pay out of and from said funds after the death of my said son, if his wife shall survive him, to her yearly, money for her sole, proper and sufficient support and maintenance, not, however, exceeding five hundred dollars, unless more is needed by her, and then such an amount as said trustees shall regard as proper and necessary, all so long as she remains his widow and no longer.

Fifthly—To pay out of and from said estate to each of said children when said child shall reach the age of twenty-one years, and to each of the children of my said daughter if she shall marry and have a child, or children, the sum of from three thousand dollars to five thousand dollars, if such child shall then be temperate and of good capacity to manage said money, all in and according to the opinion of my said trustees; and from time to time thereafter, as their wants and necessities shall require, to pay out of and from said estate such further sum or sums of money as may be necessary all under the conditions aforesaid respecting temperance and capacity; and when the youngest of said children shall arrive at the age of forty years, then all my estate shall be theirs to have and to hold the same to them and their heirs, those of them of good and regular habits and of capacity to do business and manage property, to take care of and manage as trustees the portion or portions thereof belonging to those, if any, who are not then possessed of such habits and capacity; but before said property shall vest in and be theirs, proper, suitable and sufficient bonds or other security must be given by them for the payment of said sum, or sums to my said daughter, if living, so long as she shall live, to my said son's widow, if she shall then be living, so long as she lives and remains his widow, and also for the good and sufficient support of my said son so long as he shall live.

And lastly—I hereby constitute and appoint all the said trustees to be also the only executors of this my last will and testament; and I direct that said executors and trustees and those hereafter appointed under this will shall each be exempt from giving bond, or from giving a surety or sureties on his or their bond; and in case any of said executors or trustees, or both, shall at any time decline to act as such, or die, then application shall be made by him or them who are willing to act, or are acting as such to the Supreme Court in and for said County of Strafford to fill the vacancies so caused.

### [First Codicil.]

Whereas, I have heretofore made my will and testament bearing date the ninth day of September, A. D., 1882, I now execute this codicil to said will and direct the same to be taken as a part thereof.

First—I revoke the bequest in said will to Charles Hayes, son of Elihu Hayes of New Durham, in the County of Strafford and State of New Hampshire, and declare it to be my intention that he, the said Charles Hayes, take nothing under my said will.

Second—I give and devise to my son, Hiram H. Barker, the use of the dwelling-house and lot now occupied by him in Farmington, in said County of Strafford, free of all rent during his life; and from and after the termination of his said estate, said house and lot shall pass into the hands of the trustees of my said will and codicil to be thereafter cared for, managed, or sold, and the proceeds thereof invested as in case of my other real estate.

Third—I give and bequeath to my daughter, Clara Barker, in addition to what I have given and bequeathed unto her in my said will, all my household goods, bedsteads, bedding and other furniture of every name, nature and description in my dwelling-house where I live in said Farmington; and all the farming implements, tools and carts, sleighs and sleds, all in the barn and on the premises, where I reside as above stated; and also the horse called "Gipsy," and such pleasure carriage, and robes and blankets as she may select, belonging to me.

Fourth—I give and devise unto my said daughter, Clara Barker, all the premises, including house and lands where I now live in said Farmington, for life, without impeachment of waste; and from and after the termination of her said estate then all of said real property shall pass into the hands of the trustees of my said will and codicil to be thereafter carried on, managed, improved, or sold and the proceeds thereof invested by them as provided in my said will for them to do and act respecting all my real estate.

Fifth—I give and bequeath to Lizzie M. Bickford of said Farmington, who is and for some time has been a member of my household, twenty shares in the Madison Bank, located at Madison, Dakota, when said stock is issued, the same twenty shares having been subscribed and paid for by me; and also twenty shares of stock in the Citizens' Bank, located at Hampton, Iowa. It is my order and direction that, if anything occurs whereby said Bank Stock of either, or both of said banks shall in any way or manner not prove of full value, or from any cause not be received by said Lizzie M. Bickford in due and proper time, she shall have and receive from and out my estate in money the "par value" of said stock, or one hundred dollars at least instead of each share of such stock as shall not be delivered to her as aforesaid.

Sixth—I withdraw the names of John F. Cloutman and Reuben G. Hayes from the list of trustees and executors of my will, and in place of them constitute and appoint Charles W. Talpey and James E. Fernald, both of said Farmington, believing that these latter could more easily and conveniently, considering their own private affairs, perform the business required of them as such trustees and executors of my said will and this codicil, and I also

add to the number of said executors and trustees the name of Charles W. Wingate of said Farmington, whom I also constitute and appoint such an executor and trustee.

And the trustees and executors under and by virtue of said will and codicil shall execute and carry into force and effect said codicil as well as said will.

### [Second Codicil.]

Whereas, I have heretofore made my will and testament bearing date the ninth day of September, A. D., 1882, and made a codicil to said will, said codicil bearing date the third day of August, A. D., 1886. I now execute this further and additional codicil to said will and direct the same to be taken as a part thereof.

First——I will, order and direct the trustees and executors who shall execute and carry into effect the provisions of my will and the codicils to said will, to purchase or build at an expense of not over five thousand dollars from and by means of the money in their hands belonging to and a part of my estate, a suitable house and outbuildings belonging to and used with said house; said house and other buildings to be located in Farmington in the County of Strafford and State of New Hampshire, or in any other place in said State, or any other State, for the residence and home of my son, Hiram H. Barker, in case he from any cause elects to change his residence and no longer live where he now resides; and I further order and direct that, if my said son, Hiram H. Barker, continues to reside where he now lives as his home, he shall have for and during his life, as stated and provided in said other codicil, the use and occupation of said premises free of all rent; and if he changes his residence and occupies another house and outbuildings therewith belonging to me in this town of Farmington or in any other place as provided above he shall have the use and occupation of said house and other buildings for and during his life free of all rent; and said trustees or those executing my said will shall also keep in repair all buildings in said Farmington, or elsewhere, belonging to my estate so used and occupied by my said son, at the expense of said estate alone. And when my said son ceases to occupy either of said premises as aforesaid then all of said property shall pass into the hands of the trustees and executors of my said will and be with my other property in their hands, possession and control as such. And if my son, Hiram H. Barker, prefers to hire a house and outbuildings therewith for a residence for himself and family instead of residing where he does now, or to having a new house and other buildings therewith as above provided, he shall have the right so to do in any place he may select, at a reasonable rent which shall be paid out of my estate.

Second—I also give and bequeath to my daughter, Clara Barker, a harness for her horse, all the books, pictures and provisions

and all other personal property in the house, used in house-keeping, where I reside in said Farmington not bequeathed to her in said will and codicil thereto, or either of them.

Third—I give and devise to my daughter, Clara Barker, her heirs, and assigns forever, my homestead place, or premises, where I live and have my home in said Farmington, instead of the life estate in the same, which I gave and bequeathed unto her in said codicil; and in addition to what I have before given her in said will and codicils.

Fourth—I forgive to my son, Hiram H. Barker, all notes, accounts, debts and demands, due from him to me or which may be so due at my death, and direct and order the trustees and executors of my will not to collect any of them of him or attempt so to do, but to treat them and each of them as if they never existed.

Fifth—In place of James E. Fernald I nominate and appoint Hosea B. Edgerly of said Farmington to be one of the trustees and executors of my said will; and each and all of these, who are nominated in the place of others who have been nominated in my will as such trustees and executors, shall not be required to give bond or furnish sureties on his or their bonds as such trustees and executors.

Sixth—And I also order and direct that the trustees and executors of my will shall pay all taxes on all of the premises belonging to me which shall be occupied by my said son, Hiram H. Barker, at any time as aforesaid; my order and desire being that he shall have the use and occupation of said premises free of all expense to him.

Seventh—I hereby revoke so much of my will as gives to Martha E. Hayes, daughter of Reuben Hayes, Junior, late of Madbury, in said county of Strafford, the sum of two thousand dollars, and declare it to be my intention that she take nothing under my will.

*J. G. Hall*, for the executors.

*W. L. Foster* and *Jeremiah Smith*, for the trustees. The residuary bequest is valid. The estate in remainder vests in right, title, and interest either (1) immediately upon the testator's death in the grandchildren then living, subject to open and let in afterborn grandchildren, or (2) in each grandchild who attains the age of twenty-one. [In support of various propositions under this general head, counsel cited] *Seaver* v. *Fitzgerald*, 141 Mass. 401, 403; *Loring* v. *Blake*, 98 Mass. 253, 259; 1 Per. Tr., s. 381; *Toms* v. *Williams*, 41 Mich. 552, 562; *Yeaton* v. *Roberts*, 28 N. H. 459, 466, 467; 2 Jarm. Wills (5th Am. ed., by Randolph & Talcott) 408, *n.* 2, 542, 467; *Dole* v. *Keyes*, 143 Mass. 237; *Hatfield* v. *Sohier*, 114 Mass. 48; *McArthur* v. *Scott*, 113 U. S. 340, 378, 382;

Gray Perp., ss. 110, 370, 99, 205; Lew. Perp. 459, 460, 511, 514–517, 529; Mars. Perp. 31, 208, 218, 219; *Browne* v. *Browne*, 3 Sm. & G. 568, 590; *Shattuck* v. *Stedman*, 2 Pick. 468, 470; *Fonnereau* v. *Fonnereau*, 1 Ves. Sen. 118, 119; 3 Atk. 645; *Buck* v. *Paine*, 75 Me. 582, 587; *Ordway* v. *Dow*, 55 N. H. 11, 16, 17; *Steadman* v. *Palling*, 3 Atk. 423, 428; 11 Wend. 271; *Kelly* v. *Dike*, 8 R. I. 436, 451, 452; *Vivian* v. *Mills*, 1 Beav. 315; Smith Ex. Int., s. 340; *Harrison* v. *Grimwood*, 12 Beav. 192, 198, 199; 29 N. Y. 39, 76; 1 K. & J. 713, 719, 720–723; *Fox* v. *Fox*, L. R. 19 Eq. Cas. 286, 290, 291; 2 Redf. Wills 613, n.; 9 Ves. 428, 435, 436; *Collier's Will*, 40 Mo. 287, 305, 325, 327; 3 Allen 51, 60; 58 Vt. 623, 629, 630; *Goodtitle* v. *Whitby*, 1 Burr. 228, 234; *Poor* v. *Considine*, 6 Wall. 458, 475, 478; *Cropley* v. *Cooper*, 19 Wall. 167, 174, 175; *Teele* v. *Hathaway*, 129 Mass. 164, 166; 2 Hare 14, 22, 23; 48 N. Y. 106, 121; *Herbert* v. *Post*, 26 N. J. Eq. 278, 281, 282; *Perry* v. *Rhodes*, 2 Murph. 140, 142; *Doe* v. *Perryn*, 3 D. & E. 484, 495; *In re Deighton*, L. R. 2 Ch. D. 783, 785; 33 Conn. 294, 296, 297; 53 Conn. 261, 278, 279; 63 N. H. 303, 311; *Chess's Appeal*, 87 Pa. St. 362; *Duffield* v. *Duffield*, 1 Dow & C. 268, 311, 312; *Simpson* v. *Peach*, L. R. 16 Eq. Cas. 208; 28 Barb. 432; *In re Parr's Trusts*, 41 L. J. Ch. N. S. 170; *Johnson* v. *Valentine*, 4 Sandf. 36, 45, 46; *Barnet* v. *Barnet*, 29 Beav. 239, 243; *Wright* v. *Wright*, 13 Eng. L. & Eq. 165, 166—*S. C.*, in 21 L. J. Ch. N. S. 775; *Thompson* v. *Conway*, 23 Hun 621; *Kimball* v. *Crocker*, 53 Me. 263; *Millard's Appeal*, 87 Pa. St. 457; 20 Wend. 564; 67 Ia. 369; 13 Mo. 184; 1 Sim. & St. 328, 330; 10 Sim. 412, 416; 113 U. S. 379; 41 N. H. 212, 213; 44 N. H. 283; *Leake* v. *Robinson*, 2 Mer. 363, 366, 367, 384; Hawk. Wills 224, 225; L. R. 34 Ch. D. 716, 719; 6 Ves. 248; *Allan* v. *Vanmeter*, 1 Met. Ky. 264, 271; *Oddie* v. *Brown*, 4 De G. & J. 179, 193, 194; L. R. 1 H. L. Sc. App. 232, 235; 3 Giff. 575, 581; *Goebel* v. *Wolf*, 113 N. Y. 405; 27 N. J. Eq. 540, 544–546; 7 Ves. 422; 9 Ves. 226, 230; 34 Beav. 395, 396; *Chaffers* v. *Abell*, 3 Jur. 577, 578; L. R. 3 Ch. D. 703; 4 De G. & Sm. 105; 37 Pa. St. 105, 107; 140 Mass. 102, 104, 106; 148 Mass. 223; 14 Sim. 48, 55; 3 D. & E. 41, 42; 16 Ves. 491, 506, 507; 4 Dana 570; 7 B. Mon. 623, 626, 627, 629, 630; 5 Beav. 123, 128; *Boraston's Case*, 3 Coke 19, 21; Mars. Perp. 229, 232, 233; 28 N. H. 466, 467; 19 Wall. 176; Gray Perp., s. 117, and n. 2; 140 Mass. 105, 106; 64 N. H. 36, 38; 64 N. H. 77; 64 N. H. 315, 320.

The bequest of an annuity to Hiram's widow refers to his present wife. 1 Jarm. Wills *323–*325; *Anshutz* v. *Miller*, 81 Pa. St. 212; *Hodson* v. *Ball*, 14 Sim. 558; *Lett* v. *Randall*, 3 Sm. & G. 83. The vesting in title is not postponed until after the death of his wife. There is merely a charge on the property for her benefit; and the property vests subject to that charge. 98 Mass. 259–261.

Thus far we have been assuming that the enjoyment in possession is effectually postponed to a period beyond a life in being and

twenty-one years after; and we have been arguing that, notwith-
standing this postponement of enjoyment, the bequest is sustain-
able on the ground that the title vests within the required period.
But we now submit the question, whether the enjoyment in pos-
session is effectively postponed, as has hitherto been assumed.
When a person is entitled absolutely to property, any provision
postponing its transfer or payment to him is void; and a court of
equity will decree its conveyance to him upon the attainment of
his majority (at the farthest). Here, after the death of Hiram
and Clara and Hiram's wife (all lives in being), the grandchildren
are the only persons interested in this property, and the direction
for postponement of their enjoyment may be held void. And if
the attempt to postpone enjoyment is invalid, it cannot be used to
sustain the objection of remoteness. See Gray Perp., *ss.* 120, 121;
Lew. Perp. 511, 512; 1 Jarm. Wills (R. & T. ed.) 562, *292; 2
Jarm. Wills (R. & T. ed.) 471, *n. p.;* Mars. Perp. 206, 333.

In the foregoing argument we have assumed the correctness of
the prevailing doctrine, that a devise limited to take effect beyond
the limits prescribed by the anti-perpetuity rule is void wholly,
and not merely as to the excess. And if our previous positions
are sustained, it cannot be necessary to dispute that doctrine. We
submit, however, that the soundness of that doctrine has been
questioned by high authority, and that this court are at liberty to
adopt or reject the doctrine, according as their views of justice may
dictate. Gray Perp., *ss.* 187, 188, 200, 728; Mars. Perp. 2; Lew.
Perp. 161, 162; Lew. Supp. 143. On grounds of public policy,
some rule against perpetuities will undoubtedly be adopted. But
the precise form and limits of the rule are matters resting within
the judgment of the court. The question whether a limitation
beyond the usual prescribed limits shall be treated as void wholly,
or as void only for the excess, has not been decided in this state.
*Hall* v. *Chaffee,* 14 N. H. 215; *Dennett* v. *Dennett,* 40 N. H. 498,
503; 43 N. H. 499, 501; *Wood* v. *Griffin,* 46 N. H. 230, 234–237.
The question as to holding the limitation void wholly, or void only
for the excess, being open, we submit that the court should adopt
the rule in the form recommended by the English Real Property
Commissioners. "Courts of justice do not model limitations, which
are open to the objection of perpetuity, so as to render them valid
to the extent of the rule, and void as to the excess. But great
judges have repeatedly observed that this part of the rule might
with less hardship have been differently settled. . . . In some
cases where the limits are exceeded, there is no difficulty in sep-
arating the excess, as in the case of a limitation to vest at the age
of twenty-five, by making it vest at twenty-one. . . . Some-
times a limitation is made to depend on the event of unborn persons
attaining or not attaining some age greater than twenty-one. In
such cases the testator or settlor may be reasonably presumed to
have been in ignorance of the rule, and may be well understood as

meaning either the legal age of majority, or the latest age upon which he could legally fix, not exceeding that specified. To give the required relief in such cases, we propose that the testator or settlor shall be deemed to intend the age of twenty-one." Report of the Commissioners, in Lew. Perp., *App.* 18, 20, 21, 26.

Even if the trust for the ultimate division of the principal is void, the trusts as to the expenditure of the income are valid, and the property should go into the hands of the trustees and remain there until those trusts are fulfilled. Mars. Perp. 224; *Gooding* v. *Read*, 4 De G., M. & G. 510, 511: *Read* v. *Gooding*, 21 Beav. 478; Lew. Perp. 657. The application of the income (the whole of which may be consumed) during the lives of Clara, Hiram, and Hiram's wife, would not violate the anti-perpetuity rule. The case differs from that of the *Sears will* in 120 Mass. 524 and 146 Mass. 395.

*G. E. Cochrane, Worcester & Gafney*, and *Frink & Batchelder*, for Hiram H. Barker. If there is any rule of law recognized, and in full vigor on both sides of the Atlantic, it is the so called rule against remoteness. It "has its foundation in the settled policy of the common law, . . . and must be considered as now well established." *Wood* v. *Griffin*, 46 N. H. 230, 235. "This rule is imperative and perfectly well established. An executory devise either of real or personal estate is good, if limited to vest within the compass of a life or lives in being, and twenty-one years afterwards; adding thereto, however, in case of an infant *en ventre sa mere*, sufficient to cover the ordinary time of gestation of such child. But the limitation, in order to be valid, must be so made that the estate, or whatever is devised or bequeathed, not only may, but must necessarily, vest within the prescribed period. If by any possibility the vesting may be postponed beyond this period, the limitation over will be void. And whenever there is a limitation over which cannot take effect by reason of its being too remote, the will is to be construed as if no such provision or clause were contained in it." *Fosdick* v. *Fosdick*, 6 Allen 41, 43. "It is a conceded principle that the future interest must vest within a life or lives in being and twenty-one years. It is not sufficient that it may vest. It must vest within that time or the gift is void,—void in its creation. Its validity is to be tested by possible and not by actual events. And if the gift is to a class, and it is void as to any of the class, it is void as to all. Authority is scarcely needed for so familiar a proposition. . . . We must be careful not to strain the law so as to avoid this rule. It is founded upon a sound principle of public policy, and should be rigidly enforced." *Coggins's Appeal*, 124 Pa. St. 10, 30.

" This is the old, well known, inflexible rule, established long ago in the common law, to guard against perpetuities. Whatever may be the intention of a testator, no effect can be given to it if

it violate that rule.  It may seem an arbitrary rule, but it is a wise rule, and one that must be enforced."  *Merritt* v. *Bucknam,* 77 Me. 253, 259.  " The rule of the common law against perpetuities is one of the instances wherein the living principles of the unwritten common law of England, through the forming power of an independent judiciary, has gradually shaped itself into an essential muniment and safeguard of social life."  2 Redf. Wills 845 ; 1 Jarm. Wills 502.  " The American courts have followed the English rule."  2 Redf. Wills 851.  " The rule against perpetuities is in full vigor : where the legislature has interfered, it has been to increase its stringency."  Gray Perp., *Preface* 3, 4.  No case can be found where the existence of this rule as a part of the common law of our country has ever been questioned.

While the construction of wills is no longer determined in this state by arbitrary rules of interpretation, the testator's intention must not contravene or conflict with well established rules of law. It must be expressed within legal limits.  Thus, whether an interest is vested or not is a question of intention ; whether it is within the rule against perpetuities is a question of law.  It is undoubtedly the intention of every testator that his property should go as he directs ; but his direction must be lawful.  An expressed intention that property should go to foster some unlawful or criminal purpose would not be enforced.  No more is it countenanced because it conflicts with a well considered and established rule of law which may be termed artificial.  The rule against perpetuities may defeat intention,—it never yields to it.  Gray Perp., *s.* 629.

The meaning of this will is, that the remainder, devised to the testator's grandchildren, is contingent, and does not vest till the youngest devisee arrives at the age of forty years.  [In support of various propositions under this general head, counsel cited] *Cram* v. *Cram,* 63 N. H. 35 ; *Ordway* v. *Dow,* 55 N. H. 11 ; *Brown* v. *Brown,* 44 N. H. 281, 283 ; 2 Jarm. Wills 453, 454, 472, 457, 461, 452, 423 ; Gray Perp., *ss.* 374, 431 ; *Lloyd* v. *Lloyd,* 3 K. & J. 20 ; *Leeming* v. *Sherratt,* 2 Hare 14 ; *Gifford* v. *Thorn,* 9 N. J. Eq. 702 ; *Colt* v. *Hubbard,* 33 Conn. 285 ; *Scofield* v. *Olcott,* 120 Ill. 372 ; *Hall* v. *Hall,* 123 Mass. 123 ; *Hale* v. *Hale,* L. R. 3 Ch. D. 643 ; *Pearks* v. *Moseley,* 34 Moak Eng. R. 80 ; *Blight* v. *Hartnoll,* L. R. 19 Ch. D. 300 ; *Hunter* v. *Judd,* 4 Sim. 455 ; *Vawdry* v. *Geddes,* 1 Russ. & M. 203 ; *Ford* v. *Rawlins,* 1 Sim. & St. 328 ; *Lovering* v. *Lovering,* 129 Mass. 99 ; *Illinois L. & L. Co.* v. *Bonner,* 75 Ill. 316, 327 ; *Spencer* v. *Nelson,* 6 Moak Eng. R. 830 ; *Leake* v. *Robinson,* 2 Mer. 363 ; *Warner* v. *Durant,* 76 N. Y. 136 ; *Delafield* v. *Shipman,* 103 N. Y. 467, 468 ; *Batsford* v. *Kebbell,* 3 Ves. 363 ; *Richey* v. *Johnson,* 30 Ohio St. 292 ; *In re Peek's Trusts,* L. R. 16 Eq. 221 ; *Spencer* v. *Wilson,* L. R. 16 Eq. 501 ; *Watson* v. *Hayes,* 5 Myl. & Cr. 125, 133 ; *Fox* v. *Fox,* L. R. 19 Eq. 286 ; *In re Parker,* L. R. 16 Ch. D. 44 ; *In re Grimshaw's Trusts,* L. R. 11 Ch. D. 406 ; *In re Hunter's Trusts,* L. R. 1 Eq. Cas. 295 ; *In re Ashmore's*

*Trusts,* 39 L. J. Ch. 202; *Dewar* v. *Brooke,* L. R. 14 Ch. D. 529; *In re Martin,* 57 L. T. Rep. N. S. 471; *In re Morris,* 52 L. T. Rep. N. S. 840; *In re Barnshaw's Trusts,* 15 W. Rep. 378; *In re Dawson,* L. R. 39 Ch. D. 155; 2 Redf. Wills 603, 622; *Felton* v. *Sawyer,* 41 N. H. 202; *Pickford* v. *Brown,* 2 K. & J. 427; *Howlett* v. *Hodson,* L. R. 35 Ch. D. 350; *In re Thatcher's Trusts,* 26 Beav. 365; *Rollins* v. *Riley,* 44 N. H. 9; *Randal* v. *Payne,* 1 Br. Ch. 55; *Lester* v. *Garland,* 15 Ves. 248; *Tattersall* v. *Howell,* 2 Mer. 26; *Phipps* v. *Williams,* 5 Sim. 44; *Taylor* v. *Lambert,* L. R 2 Ch. D. 177.

There is authority for the proposition that this trust is void, because it may continue for a longer period than the law admits, and may take the property out of the marts of trade. *Deford* v. *Deford,* 36 Md. 168; *Barnum* v. *Barnum,* 26 Md. 119; *Slade* v. *Patten,* 68 Me. 380; Per. Tr., ss. 381–383; *Fosdick* v. *Fosdick,* 6 Allen 41; *Thorndike* v. *Loring,* 15 Gray 391; *Pennsylvania Co.* v. *Price,* 7 Phila. Rep. 465. If the trust is void on that ground, there is no direct gift, as in *Slade* v. *Patten,* to the beneficiaries under the trust, and the whole residuary estate given to the trustees fails. But if the trust is not invalid *in toto,* two questions arise: 1. How much of it contravenes the rule against perpetuities? 2. Is the part not offending this rule separate and independent of the unlawful part?

*First.* We find a gift for the education of his son's children. The words are,—" Out of said income of my said estate means shall be furnished and provided for the education at home or abroad, at proper institutions of learning, of each and all of said children; and any other child or children of my said son, if any, hereafter born, shall have and receive all the rights and benefits from my estate that such child or children would have if living at my decease." When this provision in the will is considered, in connection with the subsequent authority to pay to all his grandchildren, after attaining their majority, such sums as in the opinion of his trustees their wants and necessities shall require, it may be that the testator intended to limit this application of income during the minority of his son's children. If so, the payment would not conflict with the rule against perpetuities. If, on the other hand, the time extends beyond their minority, and the gifts to each are not separable, the direction to pay would be bad, because it included after born children, who may participate in the income more than twenty-one years, etc., after his son's (the life in being) death.

*Second.* There is a provision for payment to his son's widow, during life or widowhood. This must be good, if limited to the present wife of his son, as she was living at the testator's death.

*Third.* There is a direction to pay to his grandchildren, when they respectively attain twenty-one years of age, certain definite sums. This direction manifestly does not transgress the rule.

*Fourth.* The trustees are directed to pay from said estate to his grandchildren after their majority, from time to time, such sums as in the opinion of the trustees their wants and necessities shall require. As this provision includes grandchildren hereafter born, it is apparently void. It is void as to grandchildren not born, and being void as to part of a class, it is so as to the whole. We think the tests of a class gift are to be found here. It is to a body of persons, uncertain in numbers and amounts, to be ascertained at some future period, out of a common fund. If it is a gift to a class, and remote as to a part, the whole gift fails. " There is often a gift to a class of persons, for example to the grandchildren of a testator, upon a contingency which may happen beyond the limits of the rule against perpetuities; as for instance, a bequest of money to be divided among those of the testator's grandchildren who may reach twenty-five. Such a gift is bad, although the testator has grandchildren living at his death. . . . The usual case of a gift to a class which violates the rule against perpetuities is that of a devise to such of the grandchildren as reach an age over twenty-one,—say twenty-five,—and this will serve as a typical case. . . . Assuming then that the devise is not to vest until the remote period, the devise to the whole class is bad." Gray Perp., *ss.* 369, 372, 373. When a gift includes in one description persons capable, and persons incapable by remoteness, the court will not remodel the will so as to support such of the bequests as are not too remote. *Ker* v. *Dungannon,* Dr. & War. 509. To the same effect is *In re Moseley's Trusts,* L. R. 11 Ch. D. 555. This gift then, standing by itself, is bad. If it was not, it is so connected with the final gift to the grandchildren as to be inseparable from it. It is part of one general scheme which violates the law of remoteness.

When there are separate trusts or persons which are not so connected together as to constitute one entire scheme, the illegal trusts may be cut off and the legal ones sustained; but not otherwise. Judge Cooley says,—"A court in sustaining one part of a will and holding void another, is in great danger of making a will never contemplated by the testator." When the income or provision for maintenance is part of an entire fund to (members of) an entire class, with a gift of the fund at some remoter period to those entitled to the income, the gift of income and the gift of the corpus have always stood or fallen together. *Pulsford* v. *Hunter,* 3 Br. Ch. 416; *In re Ashmore's Trusts,* 39 L. J. Ch. D. 202; *Thomas* v. *Wilberforce,* 31 Beav. 302; *Re Bulley,* 13 L. T. Rep. N. S. 264; *Sears* v. *Putnam,* 102 Mass. 8. In *Pickford* v. *Brown,* 2 K. & J. 429, there was a gift of real and personal estate, to pay annual income to E for life, and after death, remainder to her child or children equally, the shares to be vested in them on attaining twenty-five, the income in the meantime to be applied to maintenance. Holden: That the direction to pay income must be

invalid, as part of the gift to or in trust in favor of the grandchildren, and that the trusts, as well of real as personal estate, were void. If the court should hold the gift of a portion of the fund for support good, it would have to discriminate between children of his son living at the testator's decease and those of his son and daughter born after his death, because if it does not offend the rule as regards the former, it manifestly does as regards the latter class. Such discrimination would do violence to the expressly declared intention of the testator, which included the after born children to share with those living at his decease.

· The practical question then is, How shall this estate be administered? If the whole trust is void, or if the entire eighth clause is part of one entire scheme, the disposition of the estate in it should be declared void. But if the direction for the education of his son's children, and the annuity to the widow, and the direction for payment to the grandchildren at twenty-one are independent and separable, the trustees should retain in their hands sufficient sums to meet these obligations, and divide the balance among the heirs at law. In other words, they should retain enough to support the trust that is valid, and no more. *Sears* v. *Hardy*, 120 Mass. 542. There is no justice or reason in the claim that the trustees should hold the entire fund, when but a small portion of it is necessary to support the trust. It is simply an effort to give the trustees the emoluments of a profitable position without any justification for it.

DOE, C. J. The construction of the will, including the question whether the testator intended the remainder, which he devised to his grandchildren, should vest in them before they became entitled to a distribution of it, is determined as a question of fact by competent evidence, and not by rules of law. *Rice* v. *Society*, 56 N. H. 191, 197, 198, 203; *Brown* v. *Bartlett*, 58 N. H. 511; *Kimball* v. *Lancaster*, 60 N. H. 264; *Goodale* v. *Mooney*, 60 N. H. 528, 534, 535; *Sanborn* v. *Sanborn*, 62 N. H. 631, 643; *Kennard* v. *Kennard*, 63 N. H. 303, 310; *Bodwell* v. *Nutter*, 63 N. H. 446; *Kimball* v. *Bible Society*, 65 N. H. 139, 150; *Doten* v. *Doten, ante, pp.* 331, 333. "Good and regular habits" are a condition on which he directs that more than one right shall depend. His solicitude on this subject is significant. It is traceable, in the will, to a probable cause, and is the motive of several of his arrangements. The proviso, that when the time arrives for the distribution of the remainder among the grandchildren, "those of them of good and regular habits and of capacity to do business and manage property" shall "take care of and manage as trustees the portion or portions thereof belonging to those, if any, who are not then possessed of such habits and capacity," is evidence on the question whether he intended the remainder should vest in the grandchildren before the time of distribution. If their interest is vested,

they can sell it when they severally come of age. If they can sell it, they can consume the proceeds. He did not intend they should have power to squander it before " those of them of good and regular habits," and .competent, were authorized to save the portions of the others. When he fixed the day on which " all my estate shall be theirs to have and to hold the same to them and their heirs," with the proviso for the protection of those " who are not then possessed of " good habits and business capacity, and another proviso that " before said property shall vest in and be theirs, . . . security must be given by them," he meant that before it became " theirs " it should not be theirs in a sense that would enable the intemperate, incapable, or improvident (if such there should be), or any others, to sell or encumber an interest in it.

The trustees contend that if the remainder does not vest in the grandchildren before the time of distribution, the children of a grandchild who is then dead will take nothing; that their disinheritance was not intended by the testator; and that consequently the remainder vests before that time,—and this position is sustained by many authorities. Of various words and phrases, there is, in reported cases, a construction that would disinherit the descendants of deceased donees, contrary to the donor's intent; and the consequence of this error is often avoided by holding that an estate vested in deceased donees, contrary to his intent. When the second error merely corrects the first, the result is the same as if the will were read as he understood it.

If a will cannot be conformed to the law unless devised property vests sooner than the testator intended, the inquiry may be whether his intent as to the time of vesting is qualified by his intent that the devisees shall have the property and that the devise shall be carried into effect *cy pres.* The construction that gives to A an estate which the testator gave to A's children is far from the intent on that subject; but if it is as near as possible, it may accord with the intent on the subject of approximation. Barker's intention not to disinherit the children of grandchildren who die before the time of distribution would not be properly carried out by unnecessarily vesting the property in the grandchildren before that time contrary to his intent. Under such a variation of the will, the orphans might not receive what he meant they should have. His design might be frustrated by the construction adopted to give it effect. If his intent not to cut them off could be executed in no better way than vesting the property in their parents before the intended time, there would be a question which the case does not present.

In proprietary rights, children are regarded by the people of this state as the natural representatives of their deceased parents ; and the general meaning of testators and the general understanding of wills are, that the principle of lineal representation is accepted and acted upon as an implied basis of distribution, except so far as

a purpose to set it aside is clearly expressed. The popular construction is strengthened by the common knowledge of the law of inheritance. The act of 1718 provided that the judge of probate should order and make distribution of the real and personal estate of an intestate in manner following: a portion to the widow, and the residue to the " children, and such as shall legally represent them (if any of them be dead). . . . And in case there be no children, nor any legal representative of them, then " a larger portion to the widow, and the residue equally to the next of kin in equal degree, " and those who legally represent them: No representatives to be admitted among collaterals after brothers' and sisters' children. And if there be no " widow and no child, to the next of kin "and their legal representatives as aforesaid." Laws 1726, *pp.* 102, 103. " We often mistake for nature what we find established by long and inveterate custom." 2 Bl. Com. 11. When this will was made, the rule of representation, enacted as a natural order of succession, had been in force 164 years. Its constant operation had confirmed the instinctive idea of right, and exerted the influence of immemorial and familiar usage in defining the language of the people, raising an implication in many forms of testamentary expression that materially affects their sense, and indicating a testamentary intent to be assumed if not rebutted by convincing proof.

The prevailing view that lineal representation is a natural right, and its known operation as a legal right when not superseded by an exercise of testamentary power, is evidence that the will means that the remainder shall go, in equal shares, to the devisees living at the time of distribution, and to the children of such of them as are then dead. *Pinkham* v. *Blair*, 57 N. H. 226, 242–244. The testator's language is,—" When the youngest of said children [of the testator's son and daughter] shall arrive at the age of forty years, then all my estate shall be theirs, to have and to hold the same to them and their heirs." This would not be commonly understood to be an expression of an intent to disinherit the descendants of a deceased devisee. The generally accepted meaning would be, that such descendants are to stand in the place of the parent, and take as devisees. The competent evidence does not show that the meaning is to be found in any other than the ordinary and popular sense in which the terms of every written instrument are to be understood when a peculiar sense is not proved. 1 Gr. Ev., *s.* 278. The ordinary and popular sense being the legal sense, lineal representation is a part of the devise of the remainder to the testator's grandchildren.

Correct construction is not insured by correct views of the law. A testator's right to use words in the sense in which they are commonly understood may be infringed when that sense is not known to his judicial interpreters, or is disparaged by their educational bias. The professional and official sense sometimes introduced by construction is in effect a scholastic dialect not used by

the mass of the people. "The bulk of mankind act and deal with great simplicity; and on this is founded the rule that *benignæ faciendæ interpretationes cartarum propter simplicitatem laicorum.* Words are to be taken in their popular and ordinary meaning, unless some good reason be assigned to show that they should be understood in a different sense. . . . *Si nulla sit conjectura quæ ducat alio, verba intelligenda sunt ex proprietate, non grammatica sed populari ex usu.*" 2 Kent Com. 555. The construction is "favorable;" "for the maxims of law are, that *verba intentioni debent inservire;* and *benigne interpretamur chartas propter simplicitatem laicorum.* And therefore the construction must also be reasonable, and agreeable to common understanding." 2 Bl. Com. 379; Co. Lit. 36 a; Broom Leg. Max. 413; *Hill* v. *Grange,* Plow. 164, 170; *Williams,* J., in 6 M. & G. 314, 336; Chit. Con. 79, 81; *Perkins* v. *Mathes,* 49 N. H. 107, 110. "The peculiar indulgence extended to testators, who are regarded as *inopes consilii,* has exempted the language of wills from all technical restraint, and withdrawn them in some degree from professional influence." 2 Jarm. Wills 737; 2 Bl. Com. 381; Bac. Abr., Legacies and Devises (C); 18 Wend. 307. "Words of limitation shall operate as words of purchase; implications shall supply verbal omissions; the letter shall give way; every inaccuracy of grammar, every impropriety of terms, shall be corrected by the general meaning, if that be clear and manifest." *Chapman* v. *Brown,* 3 Burr. 1626, 1634, 1635. In this state, a peculiar want of advice or learning in drafting wills is not presumed: the common understanding of all written instruments is their legal construction, if a different meaning is not proved. One of the instances in which the authorities that defeat intention by adhering to technical rules and technical definitions are disregarded is, a devise with a remainder over if the devisee dies without issue. *Hall* v. *Chaffee,* 14 N. H. 215, 218–222, 226–240; *Bell* v. *Scammon,* 15 N. H. 381, 390, 391; *Eaton* v. *Straw,* 18 N. H. 320, 325, 327, 328–330; *Downing* v. *Wherrin,* 19 N. H. 9, 84–86; *Ladd* v. *Harvey,* 21 N. H. 514, 526; *Pinkham* v. *Blair,* 57 N. H. 226, 237, 239; *Kimball* v. *Penhallow,* 60 N. H. 448, 451. The limitation over is not based on an indefinite failure of issue, and is not prohibited by the rule against perpetuities.

"The context may show clearly that the testator meant to put two different senses upon the same word." *Best,* J., in *Murthwaite* v. *Jenkinson,* 2 B. & C. 357, 387; 2 Jarm. Wills 842. The word "children" has several ordinary and popular significations. One includes all descendants; another is limited to descendants of the first degree. In this case, the objects at which the testator was aiming are evidence that he used the word in both senses. As a description of persons, the youngest of whom (at the age of forty) he selected for the purpose of fixing the time of distribution, it was used in its limited sense. The youngest of all future generations was not the individual named for that purpose. And as he

used the word "children" in the limited sense before he said his estate should be "theirs," a literal reading would disinherit the children of deceased children. But the general and substantially universal understanding that, as a description of legatees and devisees, "children" includes the issue of those who die after the will is made, is sufficient evidence that the devise to children expresses an intent to include such issue.

"Upon the *reason* of the thing, the *infant* is the *object* of the testator's bounty: and the testator does not mean to deprive him of it, in *any event*. Now suppose that this object of the testator's bounty *marries*, and *dies before his age of 21, leaving children; could the testator intend*, in such an event, to *disinherit him?* Certainly he could not." *Goodtitle* v. *Whitby*, 1 Burr. 228, 234. "The disinheritance of issue of any child who may marry and die before the expiration of the trust period" is "a consequence which no one can doubt the testator never intended." *Goebel* v. *Wolf*, 113 N. Y. 405, 415. "We cannot presume such to have been the intention of the testator." *Dale* v. *White*, 33 Conn. 294, 297. "In ninety-nine cases out of a hundred it is the intention of the testator that his bounty should be transmitted to the children or family of the beneficiary, otherwise indeed full effect is not given to it." *Chess's Appeal*, 87 Pa. St. 362, 365. Their disinheritance "would not be presumed to be intended by the testatrix unless such intention is clearly manifested." *Teele* v. *Hathaway*, 129 Mass. 164, 166; *Collier's Will*, 40 Mo. 287, 325. "The testator could not have intended such a result." *Doe* v. *Considine*, 6 Wall. 458, 478; *Cropley* v. *Cooper*, 19 Wall. 167, 175; *Buller*, J., in *Doe* v. *Perryn*, 3 D. & E. 484, 495; *Perry* v. *Rhodes*, 2 Murph. 140, 142. Barker's intention that, at the time of distribution (determined by legal construction), the children of deceased grandchildren should take as devisees, is not modified by conflicting intent, or by law.

By annuities and otherwise, the testator, a widower, made what he considered suitable provision for C. and H., his only children. He clearly expressed his purpose that the remainder of his estate should not vest in them, but should vest in their children "when the youngest of said children shall arrive at the age of forty years." If he had said "when the youngest of said children shall arrive at the age of twenty-one years," the validity of the devise to them would not have been questioned. H. contends that the remainder may not vest within a period prescribed by law, that the devise is void for remoteness, and that the remainder vested in C. and H. at the testator's death as intestate property. It is not now necessary to determine the legal possibility of knowing, during the lives of C. and H. (Gray Perp., s. 215), who will be the youngest of their children. Without considering that question, it is assumed that during the lives of C. and H. the remainder will not vest in their issue.

A dominant idea of the residuary clause and of the whole will is, that the testator's grandchildren shall have the bulk of his estate. Not less dominant or less manifest is his determination that C. and H. shall not have it. His intent would not have been plainer if he had inserted a declaration that the grandchildren's remainder should not be transferred from them to C. and H. by judicial construction. The question is, whether his appointment of the time of vesting in the grandchildren is wholly or partially void for remoteness because he said "forty" instead of "twenty-one," and whether his inability to postpone the vesting as long as he wished is a reason why the property should not go to those to whom he gave it. Could he suspend the grandchildren's ownership beyond the time when the youngest of them would arrive at the age of twenty-one years? If he could not, does their title fail? He willed that the remainder should be theirs. When it should be theirs was another point for him to decide. Upon consideration of such matters of law and fact as were within his knowledge, he chose the time when the youngest would be forty years old. He did not know that, on a judicial view of public policy, they should have it nineteen years sooner. Is this a ground on which it can be held that they shall not have it at all?

There is no evidence, direct or inferential, and no reason to believe, that the testator regarded his grandchildren's title as inseparably connected with his appointment of the time of vesting, or as resting upon the validity of that appointment. In his mind, the main point evidently was the extent to which he disinherited C. and H., and put their children in their places. The time when the property, after supporting the first generation of his heirs, should pass to the second, must have been, in his estimation, a matter of less consequence. His understanding is a question of probability. *Rice* v. *Society*, 56 N. H. 191, 197, 198, 203. It is not probable that he understood the change he made in the natural and legal order of succession would depend upon the property's being withheld from the grandchildren nineteen years after the youngest came of age.

The will, made in 1882, bears marks of deliberation. It cannot be assumed that the testator ever forgot the circumstances of his family, or his reasons for making a will. His deliberation would not be likely to cease in 1882. In 1886 he added two codicils, increasing the provision for C. and H., but making no change that affects the present inquiry. The will he had made, and his reasons for making it, were still in his mind. He died in 1887. At that time his only daughter, C., was about forty-five years old, and unmarried. His only son, H., was thirty-five years old, had been married fifteen years, and had five children, and his wife was thirty-two years old. There might be a failure of issue, and the remainder might go to collateral heirs. The testator acted upon the presumption that there would not be an early failure of issue,

and that the remainder would go to his descendants.    He had reason to expect, and the provision for the education of grandchildren shows he did expect, his only issue, after the death of C. and H., would be the issue of H.    The care with which he studied the interests of both generations is evinced by the elaborate details of the will and codicils, and the natural anxiety of a person in his situation.    Whatever doubts may be entertained of the wisdom of his conclusions, they were presumably reached and held upon all the painstaking he was capable of in weighing the evidence of his duty.    After years of observation and reflection, his unchanged judgment was, that the welfare of his issue required an absolute provision for the comfort of C. and H. during their lives, a conditional appropriation of $30,000 for H., other special appropriations (including one for education), and a devise of the remainder to the grandchildren.    In this manner, and to this extent, he was convinced it was his duty to modify the operation of the statutory rule of distribution.    His exercise of testamentary power to this end was his primary and leading purpose.    He looked. upon the postponement of the grandchildren's title nineteen years after the youngest came of age as comparatively unimportant.    Taking his view of the condition and prospects of his children and grandchildren, as that view is disclosed in the will, and considering his manifest reasons for disposing of his property as he did, there is no doubt on the question of what is called primary and secondary, or general and particular, intent.

The justice and necessity of withholding the control of his estate from C. and H., and settling nearly the whole of it in trust for their benefit and the benefit of their children, is a question on which there is no appeal from his decision.    He may have had reason to fear that, without such a settlement, the support of C. and H. and their children would soon become a public charge.    18 Wend. 276, 309, 310.    The legislature had authorized him to guard his issue and the public against that misfortune, and had not fixed a time beyond which an estate could not be vested by an executory devise.

"A great proportion of the rules and maxims which constitute the immense code of the common law   .   .   .   was the application of the dictates of natural justice and of cultivated reason to particular cases."    1 Kent Com. 471.   "The common law consists of a few broad and comprehensive principles, founded on reason, natural justice, and enlightened public policy.    .   .   .   It has its foundations in the principles of equity, natural justice, and that general convenience which is public policy."   *Norway Plains Co.* v. *Railroad*, 1 Gray 263, 267, 268.   "It is the great merit of the common law, that it is founded upon a comparatively few broad, general principles of justice, fitness, and expediency."   *Com.* v. *Temple*, 14 Gray 69, 74; *Jones* v. *Randall*, Cowp. 37, 39.    In the absence of statutory regulation, the inability of a testator or

grantor to suspend the vesting of a legal or equitable title for an unreasonable time, is a portion of a mass of common law that con-- sists of what is judicially recognized as convenient, expedient, and required by the common welfare.   A requirement that titles shall vest in a reasonable time, is readily accepted as a rule dictated by public interests clear enough and strong enough to determine pub- lic policy, and to be classed with moral right as evidence of law. The rule against perpetuities and unreasonable remoteness " was created to effect a general end of public policy, and there is no· reason in history or policy why all future interests should not fall within it."   Gray Perp., *s.* 298; *Wood v. Griffin,* 46 N. H. 230, 235.

" The necessity of imposing some restraint on the power of postponing the acquisition of the absolute interest in or dominion over property will be obvious if we consider   .   . .   what would be the state of a community in which a considerable proportion of the land and capital was locked up.   . . .   Such a state of things would be utterly inconsistent with national prosperity ; and those restrictions which were intended by the donors to guard the objects of their bounty against the effects of their own improvi- dence, or originated in more exceptional motives, would be bane-- ful to all.   Perhaps these restrictions most frequently spring from the desire to exert a posthumous control over that which can be no longer enjoyed."   1 Jarm. Wills 250, 251.   " On the same reason with bonds and contracts in restraint of trade, stand perpetuities ; attempts to create which are never permitted by the law to succeed,. on account of the tendency of such limitations to paralyze trade by shackling property and preventing its free circulation for the pur- poses of commerce.   . . .   This doctrine of perpetuities, as it is called, is of comparatively modern introduction.   Its objects. were indeed, at a very ancient period of English law, in some degree accomplished by a maxim   . . .   that property has cer- tain inseparable incidents, among which is the right of aliening it." 1 Sm. Lead. Cas. 183 d.   " If a feoffment be made upon this con- dition, that the feoffee shall not alien the land to any, this condi- tion is void."   Litt. Ten., *s.* 360.   "And the like law is of a. devise in fee upon condition that the devisee shall not alien ; the condition is void.   . . .   And so it is, if a man be possessed of a lease for years, or of a horse, or of any other chattel, real or per-- sonal, and give or sell his whole interest or property therein upon condition that the donee or vendee shall not alien the same, the same is void, because his whole interest and property is out of him, so as he hath no possibility of a reverter, and it is against trade and traffic, and bargaining and contracting between man and man." Co. Lit. 223 a; Gray Restraints on Alienations, *s.* 279.

" These executory devises   . . .   have some of the inconven- iences of estates tail, as they lock the property up during the period that the contingency may happen, without any power of

alienation. . . . This operation of executory devises, or, in other words, of contingent estates created by will, tended to fetter real estates by a species of perpetuity, and prevent them from circulating from owner to owner, as the ends of commerce or the exigencies and wants of families might require. The courts of justice have therefore wisely and steadily determined that they would not permit these executory devises to tie up property beyond a moderate and reasonable period." *Anderson* v. *Jackson*, 16 Johns. 382, 398, 399.

" The history of executory devises presents an interesting view of the stable policy of the English common law, which abhorred perpetuities, and the determined spirit of the courts of justice to uphold that policy, and keep property free from the fetters of entailments, under whatever modification or form they might assume. Perpetuities, as applied to real estates, were conducive to the power and grandeur of ancient families, and gratifying to the pride of the aristocracy; but they were extremely disrelished by the nation at large, as being inconsistent with the free and unfettered enjoyment of property. 'The reluctant spirit of English liberty,' said Lord *Northington*, 'would not submit to the statute of entails: and Westminster Hall, siding with liberty, found means to evade it.' Common recoveries were introduced to bar estates tail; and then, on the other hand, provisos and conditions not to alien . . . were introduced to recall perpetuities. The courts of law would not allow any such restraints . . . to be valid. . . . Executory limitations were next resorted to, that men might attain the same object. . . . This species of limitation . . . was slowly and cautiously admitted, prior to the leading case of *Pells* v. *Brown*" [1620] which " established the legality of an executory devise of the fee upon a contingency not exceeding one life, and that it could not be barred by a recovery. . . . The limits of an executory devise were gradually enlarged. . . . In 1736 . . . the addition of twenty-one years to a life or lives in being was held to be admissible. . . . A devise of lands in fee to such unborn son of a *feme covert* as should first attain the age of twenty-one, was held to be good; for the utmost length of time that could happen before the estate would vest, was the life of the mother, and the subsequent infancy of the son. . . . When an executory devise is duly created, it is a species of entailed estate." 4 Kent Com. 264, 265, 267, 270.

"All these perpetuities [of entailment] were against the reason and policy of the common law; for at common law all inheritances were fee-simple. . . . The true policy and rule of the common law in this point was in effect overthrown by the statute *de donis conditionalibus* made *anno* 13 E. I. which established a general perpetuity by act of parliament, for all who had or would make it, by force whereof all the possessions of England in effect were entailed accordingly, which was the occasion and cause of the said and

divers other mischiefs." *Mildmay's Case*, 6 Co. 40. "It was adjudged by *Beresford* that the issues in tail should not alien no more than they to whom the land was given, and that was the intent of the makers of this act." 2 Inst. 336. " The nobility, in order to perpetuate their possessions in their own families, procured the statute . . . to be made." By allowing estates to be entailed, the law " made it impossible to diminish the property of the great families; and at the same time left them all means of increase and acquisition. . . . The impossibility of obtaining a legislative repeal of the statute *De Donis* induced the judges to adopt various modes of evading its effects, and of enabling tenants in tail to charge or alien their estates." 1 Cruise Dig. 77, 78, 101, 102.

" The inconvenience of these fettered inheritances is as strongly described, and the policy of them as plainly condemned, in the writings of Lord Bacon and Lord Coke as by subsequent authors, and the true policy of the common law is deemed to have been overthrown by the statute *dé donis* establishing those perpetuities. Attempts were frequently made in parliament to get rid of them, but the bills introduced for that purpose . . . were uniformly rejected by the feudal aristocracy, because estates tail were not liable to forfeiture for treason or felony, nor chargeable with the debts of the ancestor, nor bound by alienation. They were very conducive to the security and power of the great landed proprietors and their families, but very injurious to the industry and commerce of the nation. It was not until *Taltarum's Case*, 12 Edw. IV., that relief was obtained against this great national grievance, and it was given by a bold and unexampled stretch of the power of judicial legislation. The judges, upon consultation, resolved that an estate tail might be cut off and barred by a common recovery. . . . The desire to preserve and perpetuate family influence and property is very prevalent with mankind. . . . If the doctrine of entails be calculated to stimulate exertion and economy, by the hope of placing the fruits of talent and industry in the possession of a long line of lineal descendants, undisturbed by their folly or extravagance, it has a tendency on the other hand to destroy the excitement to action in the issue in tail, and to leave an accumulated mass of property in the hands of the idle and the vicious. Dr. Smith insisted, from actual observation, that entailments were unfavorable to agricultural improvements. . . . Some of the most distinguished of the Scotch statesmen and lawyers have united in condemning the policy of perpetual entails, as removing a very powerful incentive to persevering industry and honest ambition. They are condemned as equally inexpedient and oppressive. . . . Entailments are recommended in monarchical governments as a protection to the power and influence of the landed aristocracy; but such a policy has no application to republican establishments, where wealth does

not form a permanent distinction, and under which every individual of every family has his equal rights, and is equally invited by the genius of the institutions to depend upon his own merit and exertions. Every family, stripped of artificial supports, is obliged, in this country, to repose upon the virtue of its descendants for the perpetuity of its fame." 4 Kent. Com. 13, 19, 20; *Anderson v. Jackson,* 16 Johns. 382, 435.

The act of parliament allowing estates tail to exist in England had no effect in the colonies as a statute, and did not become common law in this province by implied adoption. " Our ancestors brought with them only such parts of the laws of England as were adapted to their new condition, and, we may add as quite important, such only as were conformable to their principles. . . . Not only in regard to the common law, but as to the statutes in force at the time of their settlement, some parts were adopted, some entirely rejected, and some adopted with important modifications." 1 Bl. Com. 108, Sharswood's *note;* 1 Kent Com. 473; *Concord Mfg. Co.* v. *Robertson, ante, pp.* 1, 6, 7, 15, 17, 19; *State* v. *Saunders, ante, pp.* 39, 72, 73; *Ricker's Petition, ante, pp.* 207, 226. The ancient policy of the common law, that inheritances should be vested, alienable, and unfettered, was the policy of the New Hampshire colonists. They were not members of the ruling class who introduced the grievance of perpetual entails. The statute *de donis,* not being conformable to their principles or adapted to their institutions and wants, was a part of a great body of law from which they liberated themselves by migration. The act of 1837 (*c.* 340, Rev. St., *c.* 129, *s.* 1) authorizing tenants in tail to convey by deed, was declaratory of the common law (*Welles* v. *Olcott,* Kirby 118, *Chappel* v. *Brewster,* Kirby 175, *Hamilton* v. *Hempsted,* 3 Day 332), and was designed to remove the doubt which naturally existed in the absence of explicit legislation (*Jewell* v. *Warner,* 35 N. H. 176, 177, 180), and which had been a reason for resorting to the collusive fiction of a common recovery (2 Bl. Com. 357–361) in some conveyances of New Hampshire land. A rule against perpetuities, applicable to entails and the creation of estates at future times unreasonably remote, is a doctrine of the common law that " grows out of the situation and circumstances of the people" (*Brown* v. *Langdon,* Smith, N. H., 178, 182),—in other words, out of that general convenience which is public policy. The question of policy necessarily relates to the community whose interests are concerned.

In 1699 the court " held that an executory estate to rise within the compass of a reasonable time is good; that 20 nay 30 years has been thought a reasonable time. So is the compass of a life or lives; for let the lives be never so many, there must be a survivor, and so it is but the length of that life (for Twisden used to say the candles were all lighted at once); but they were not for going one step farther, because these limitations make estates unalienable, every executory devise being a perpetuity as far as it

goes, that is to say, an estate unalienable, though all mankind join in the conveyance." *Scatterwood* v. *Edge*, 1 Salk. 229. "At first it was held that the contingency must happen within the compass of a life or lives in being, or a reasonable number of years; at length it was extended a little further, viz., to a child *en ventre sa mere* at the time of the father's death; . . . and the rule has, in many instances, been extended to 21 years after the death of a person in being." *Goodtitle* v. *Wood*, Willes 211, 213 (1740). " The number of contingencies are not material if they are all to happen within a life in being, or a reasonable time afterwards." *Gulliver* v. *Wickett*, 1 Wilson 105, 107. " The only question is, whether they are to happen within a reasonable time or not." *Buller*, J., in *Thellusson* v. *Woodford*, 4 Ves. 227, 328.

" The contingencies ought to be such as may happen within a reasonable time; as within one or more life or lives in being, or within a moderate term of years, for courts of justice will not indulge even wills so as to create a perpetuity, which the law abhors: because by perpetuities (or the settlement of an interest which shall go in the succession prescribed without any power of alienation) estates are made incapable of answering those ends of social commerce, and providing for the sudden contingencies of private life, for which property was at first established." 2 Bl. Com. 173, 174. " Such contingency must happen within a short space of time; such as a life in being or some few years after; otherwise it would be in a testator's power to limit an estate unalienable for generations to come ; a power which the law very wisely denies to every man, as the exertion of it would tend to render property in great measure useless to the general purposes and calls of a commercial society." Fearne Rem. 314, 315. " The object of the rule against perpetuities was to prevent property's being tied up for a longer time than was deemed reasonable, so that it could not be alienated absolutely by the owners." 14 Am. L. Rev. 237.

[" The object of the rule against perpetuities cannot be simply to prevent the tying up a particular parcel of land, or other specific thing, as would seem from the language of many of the books; . . . for it is applied to a legacy of money, and also when the trustees . . . have power to change the investment. In such cases, no specific property is rendered inalienable. . . . A perpetuity of this sort is necessarily created when a fund is devoted to a charity absolutely. Even if specific property is not rendered inalienable, the proceeds of the fund can only be applied in one way forever." 4 Kent Com. 283, note by Holmes.] " It has been . . . said that if future interests can be alienated or released, they cannot be too remote, and that the rule against perpetuities is aimed only at such limitations as tie up property and take it absolutely out of commerce. . . . The rule applies to cases where there is no tying up of property. For instance, suppose real

and personal property are given to trustees and their heirs, with full power of changing investments, but upon trusts which may arise more than twenty-one years after lives in being, such trusts are void, yet no property is tied up. But, further, conditional limitations may be bad for remoteness, though they are releasable or alienable. . . . The true object of the rule against perpetuities is to prevent the creation of interests on remote contingencies. Its effect in removing restrictions on the immediate conveyance of property is only an incident. . . . It is not the alienability of an interest dependent on a remote contingency, but its utterly uncertain value, which furnished the sufficient justification, if it was not the original ground, of the rule against perpetuities. If there is a gift over of an estate on a remote contingency, the market value of the interest of the present owner will be greatly reduced, while the executory gift will sell for very little, or, in other words, the value of the present interest *plus* the value of the executory gift will fall far short of what would be the value of the property if there were no executory interest." Gray Perp., *ss.* 268, 269, 140, 141, 159, 236, 241.

[The alienable character of property is not usually understood in a sense large enough to bring a case of this kind (a trust with full power of changing investments) within the operation of the rule against remoteness. The reasons of the rule are not fully stated in the authorities. Its application may require a wide view of public policy, including the legal nature and design of property, the reasonable extent of an owner's posthumous control, and the economic and moral effects of realty and personalty being largely held in trusts of long duration for mere accumulation, or for purposes of entailment. Divers evils could be materially increased and unduly perpetuated if the law allowed long-continued accumulations of estates in trust for future private use, or appropriations to maintain grantees or legatees, and their heirs, forever or for many generations, without effort or care on their part, and without ability to waste or lose the capital devoted to their support.]

" The most universal and effectual way of abandoning property is by the death of the occupant: when both the actual possession and intention of keeping possession ceasing, the property which is founded upon such possession and intention ought also to cease of course. For, naturally speaking, the instant a man ceases to be, he ceases to have any dominion: else, if he had a right to dispose of his acquisitions one moment beyond his life, he would also have a right to direct their disposal for a million of ages after him: which would be highly absurd and inconvenient. All property must therefore cease upon death, considering men as absolute individuals, and unconnected with civil society." 2 Bl. Com. 10. Whatever may have been the origin of proprietary rights, the power of grantors and testators to control the tenure, possession, use, and alienation of property after it ceases to be theirs, is one

of the subjects on which the interests of society are sufficiently clear and strong to be evidence of common law. By that law an owner's imposition of unreasonable restrictions upon the legal and equitable titles of his successors is not one of the rights of which property consists; and the common-law elements of ownership are not extinguished by a statute conferring or regulating the power of alienation by deed or will. An inability to postpone the vesting of an estate for an unreasonable time is one of many instances of a proprietor's loss of control when he parts with his title. The rule against remoteness is not a detached doctrine, but a broader principle, applied to the creation of remote interests.

" The policy of the law, where a man dies leaving an infant son, restrains alienation until such infant attains twenty-one, and as such infant may not be born until nine or ten months or perhaps a further period after the death of its father, the power of alienation is of course suspended during that period; and as the law imposes such suspension of the power of alienation on the infant, so it will permit such suspense by the owner for a like period; for whether it arises from the act of the law or of the party, the effect will be the same in relation to the interest of the public in property, which is what is consulted in the doctrine of perpetuities." Fearne Rem. 321, Powell's *note* (4th ed., *vol.* 2, *p.* 113). "Estates may be unalienable for lives in being and twenty-one years, merely because a life may be an infant, or *en ventre sa mere.*" *Arden,* M. R., in *Thellusson* v. *Woodford,* 4 Ves. 227, 337 (1799). "The established length of time during which the vesting may be suspended is during a life or lives in being, the period of gestation, and the infancy of such posthumous child." *Macdonald,* C. B., delivering the opinion of the judges in *Thellusson* v. *Woodford,* 11 Ves. 112, 143 (*S. C.,* 1 N. R. 357, 393) (1805). "That rather implies that he thought the rule was confined to cases of minority." *Bayley,* B., delivering the opinion of the judges in *Cadell* v. *Palmer,* 10 Bing. 140, 145—*S. C.,* 1 Cl. & F. 372 (1833). "The twenty-one years are introduced to provide for the minority of a child born, and a few months are allowed to let in a posthumous child." *Hawley* v. *Northampton,* 8 Mass. 3, 38; Gray Perp., *ss.* 171, 176.

"Upon the introduction of executory devises, . . . care was taken that the property which was the subject of them should not be tied up beyond a reasonable time. . . . The cases of *Lloyd* v. *Carew,* Show. P. C. 137, in the year 1696, and *Marks* v. *Marks,* 10 Mod. 419, in the year 1719, established the point that for certain purposes such time as, with reference to those purposes, might be deemed reasonable beyond a life or lives in being, might be allowed. The purpose in each of those cases was to give a third person an option, after the death of a particular tenant, to purchase the estate; and twelve months in the first case, and three months in the other, were held a reasonable time for that purpose.

These cases  .  .  .  do not necessarily warrant an inference that a term of twenty-one years, for which no special or reasonable purpose is assigned, would also be allowed.  .  .  .  *Taylor* v. *Biddall*, 2 Mod. 289 (1677), is the first instance we have met with in the books in which so great an excess as twenty-one years after a life or lives in being was allowed.  .  .  .  That, however, was a case of infancy, and it was on account of that infancy that the vesting was postponed. This case was followed by, and was the foundation of, the decision in *Stephens* v. *Stephens*, Cas. temp. Talb. 232 (1736).  .  .  .  This also was a case of infancy; it was on account of that infancy that the vesting of the estate was postponed.  .  .  .  These decisions therefore do not distinctly or necessarily establish the position that a term in gross for twenty-one years, without any reference to infancy, after a life or lives *in esse*, will be good by way of executory devise; but there is nothing in them necessarily to confine it to cases of infancy.  .  .  .  The limit is a life or lives in being, and twenty-one years afterwards, without reference to the infancy of any person whatever. This  .  .  .  will not tie up the alienation an unreasonable length of time." *Cadell* v. *Palmer*, 10 Bing. 140, 142–144, 151 —*S. C.*, 1 Cl. & F. 372 (1833). In the same case it was held that although a period of twenty-one years can be allowed without an infant, a period of nine months cannot be allowed without gestation.

The devise to trustees for the support of the testator's children during their lives, remainder to his grandchildren (born and unborn) when the youngest is forty years old, is an unreasonable suspension of the grandchildren's future estate. The vesting of their remainder cannot be postponed beyond the time when the youngest is twenty-one. *Marston* v. *Carter*, 12 N. H. 159, 162; *Dennett* v. *Dennett*, 40 N. H. 498, 503; 43 N. H. 499, 501; *Wood* v. *Griffin*, 46 N. H. 230, 234. The number of lives in being that may be designated as a part of the period of postponement, and the power of including the lives of persons to whom no interest is given, and adding a term of twenty-one years in gross without reference to the infancy of a beneficiary (Gray Perp., ss. 171–190, 216–219, 223, 224, Lew. Perp. 167), are open questions in this jurisdiction. A devise to trustees for accumulation during the lives of all the testator's descendants living at his death, and twenty-one years more, without reference to a case of infancy, and then to his most wealthy heir bearing his name, would require an examination of the reasons of the law, and of the reasons given for the judgments rendered in such cases as *Thellusson* v. *Woodford*, 1 B. & P. N. R. 357, 4 Ves. 227, 11 Ves. 112, and *Cadell* v. *Palmer*, before cited. There are many English rules the adoption of which is not necessary here to prevent a disturbance of titles; and *Britton* v. *Turner*, 6 N. H. 481, 486, and *Hall* v. *Chaffee*, 14 N. H. 215, 226–240, are precedents for a course that may be taken on any subject when foreign authorities are in conflict with elementary

principle. The opinion of the majority of the court in *Hall* v. *Chaffee* sustains a testator's intention against an English rule of construction in the application of the law of perpetuities. In *Norfolk's Case,* 3 Ch. Cas. 1, 36, 49, Lord *Nottingham* was pressed with this case: "Suppose a contingency which must take effect, if at all, within one hundred years, but may not take effect any sooner. What then? Where will you stop?" "Where?" he answered. "Why, everywhere, where there is not any inconvenience. . . . You may limit, it seems, upon a contingency to happen in a life. What if it be limited, if such a one die without issue within twenty-one years or a hundred years, or while Westminster Hall stands? Where will you stop, if you do not stop here? I will tell you where I will stop: I will stop wherever any visible inconvenience doth appear." Gray Perp., *s.* 169. Entails, perpetuities, restraints on use (62 N. H. 55) or alienation, and contracts in restraint of trade ([1894] A. C. 535, 553, 554) present questions of visible inconvenience, generally called questions of public policy, in the decision of which it may be necessary to consider what is reasonable and expedient.

The feudal doctrine of forfeiture for and by a conveyance of a larger interest than the grantor has, is no part of our common law. *Fletcher* v. *Chamberlin,* 61 N. H. 438, 483, 484. A lease for forty years, made under a power to lease for twenty-one years, is good for twenty-one. *Alexander* v. *Alexander,* 2 Ves. Sen. 644. Under a statute restricting to a term not exceeding twenty-one years the time for which a tenant for life can be empowered to lease, a testamentary gift to a tenant for life of a power to lease for sixty-three years is not void. If he makes a lease for more than twenty-one years, it is void for the excess, and no more. *Nelson,* C. J., and *Bronson* and *Cowen,* JJ., in *Root* v. *Stuyvesant,* 18 Wend. 257, 273, 275–277, 290, 291, 302, 306, 307, 313. "If I had come to a different conclusion," says *Nelson,* C. J., "and been obliged to hold the power to lease void, still I could not concur with the court below in breaking up the other independent portions of the will. . . . The chancellor . . . argues that the general and important intent of the testator was, to give a beneficial estate to his children in preference to remoter descendants; and that the loss of the power so far defeats this intent that the will cannot consistently be upheld. But it must not be forgotten that it is at least equally clear that the testator did not intend his children should take the fee: *that* he secured to their children, or descendants. For aught we can know he had good reasons for thus withholding it. . . . We cannot comprehend the operations of the mind of the testator, and hit with certainty the motive that led to this provision. The nearest approximation to be made is by considering the language he has used; and . . . I am . . . unable to say that the intent to give the power to lease was paramount to that which operated to give the estate for life; or that if he had known the power to be void, he would have given the fee.

On the contrary, the peculiar and special feature of the will appears to be the provision which secures beyond contingency the estate to the descendants of his children; that is the object and end of the whole will; the life estates, the power of appointment, and the remainders over in default, are all in furtherance of this design and agreeably to the rules of law. Thus the life estates are an inseparable part of the scheme of this family settlement, and must be maintained to carry it into effect. If I must take the place of the testator, and decide for him whether he would give up the power to lease, or the residue of the will, . . . I must say he would have yielded the former; that the disposition of the residue does not necessarily hang upon it."

"I do not think we are required by any rule of construction," says *Cowen*, J., in the same case, "to declare that a power which, when executed in a proper way within legal limits would be perfectly valid, is void because an abortive attempt may be made under it to create an estate so remote as improperly to suspend alienation. . . . We are to read this will just as if the testator had incorporated in it all the provisions of the revised statutes any way applicable; and then declared that so far as those statutes allow he desired his will might prevail, and that it should be void in those respects only wherein they declared it should be invalid. . . . In *Alexander* v. *Alexander*, 2 Ves. Sen. 644, the master of the rolls said, 'Suppose a power to lease for twenty-one years, and he leases for forty: that shall be good for the twenty-one, because it is a complete execution of the power, and it appears how much he has exceeded it. If the court can see the boundaries, it will be good for the execution of the power, and void as to the excess.' In *Thellusson* v. *Thellusson*, 4 Ves. 325, *Buller*, J., followed Lord *Talbot* when he declared that in the case of wills 'the method of the courts has been, not to set aside the intent because it cannot take effect so fully as the testator desired; but to let it work as far as it can.' . . . These sound views have grown into a maxim applicable to almost every legal transaction: *Valeat quantum valere potest*. To deeds, wills, and the execution of powers, may be added judgments, awards, and all contracts, releases, and discharges. . . . *Utile non debet per inutile vitiari*. . . . Suppose the parents [of the testator's grandchildren] to prove insolvent, dissipated, or extravagant, it would be a disgrace to the law should we break up the titles of these innocent objects of the testator's bounty, and put them to the hazard of final loss by an idle slip of the pen in the creation of a leasing power."

"Courts lean in favor of the preservation of all such valid parts of a will as can be separated from those that are invalid, without defeating the general intent of the testator. . . . A single trust created for two purposes, one lawful and the other unlawful, is good for the lawful purpose although void for the unlawful one." *Harrison* v. *Harrison*, 36 N. Y. 543, 547, 548. "It is difficult to

discover any principle which forbids the sustaining of the general intent of the testator by cutting off a void trust which is separable from other valid trusts, in a case where the trust which is defeated is independent of the other dispositions of the will and subordinate to them, and is not an essential part of the general scheme." *Manice* v. *Manice*, 43 N. Y. 303, 384. This is "merely a statement in another form of the general proposition that valid and void trusts when independent of each other may be separated, and the one rejected and the other sustained." *Van Schuyver* v. *Mulford*, 59 N. Y. 426, 432. "When several trusts are created, and they are independent of each other, each trust complete in itself, and the legal can be separated from the illegal and upheld without doing injustice, or defeating what the testator might in the emergency be presumed to wish, the illegal trust may be cut off and the legal permitted to stand, and thus the intention of the testator be effectuated so far as the law will permit." *Kennedy* v. *Hoy*, 105 N. Y. 134, 137, 138; *Underwood* v. *Curtis*, 127 N. Y. 523, 541, 542. "Courts should endeavor, by every reasonable intendment and by a liberal construction, to sustain a testamentary disposition of property, when, in so doing, they can give actual and just effect to the testator's purpose, and validate at least the main if not the true part of a testamentary scheme which contemplates distinct and severable acts." *Henderson* v. *Henderson*, 113 N. Y. 1, 16. "The endeavor is to find a way of upholding the will, not of breaking it down." *Greene* v. *Greene*, 125 N. Y. 506, 512.

"It is now considered to be the settled rule of law in New York, that the will of a testator is to be carried into effect so far as that intention is consistent with the rules of law; that although some of the objects for which a trust is created, or some future interests limited upon a trust estate, are illegal and void, yet if any of the purposes of the trust are valid, the legal title vests in the trustees during the continuance of such valid objects of the trust, provided the legal be not so mixed up with the illegal objects of the trust that one cannot be sustained without giving effect to the other." 4 Kent Com. 281, *n. a.*

Withholding the remainder from Barker's grandchildren beyond a reasonable time was not the sole or the main purpose for which he devised nearly all his estate to trustees; and his inability to postpone the grandchildren's title unreasonably does not invalidate the trustees' title, nor prevent their doing the lawful fiduciary work which he ordered them to do. The general devise in trust vests the legal estate in them for such legal purposes as require their services. It is a good devise for the valid uses (including the interests, absolute and conditional, of C. and H.) for which the trustees are directed to hold the property during the lives of C. and H. *Greene* v. *Greene*, 125 N. Y. 506, 510. During their lives, the trust will not infringe any rule of law. During the intended continuance of the trust, the testator meant the

remainder should vest in no one but the trustees.   The law does
not give his children what he gave his grandchildren, nor give his
grandchildren what he gave his children.   At some time the grand-
children will have their remainder.   If his appointment of the
time when it is to pass to them from the trustees were a mere nul-
lity, the consequence would be, not that substantially the whole
will would be unnecessarily broken, but that the remainder would
pass at the termination of the life interests of C. and H. / Beyond
that time, the validity of the trust depends upon the question
whether on this point the will is a mere nullity, or whether the
testator's intent that the remainder shall pass at a period more dis-
tant than the law allows is carried into effect as nearly as it can
be, that is, at the most remote legal time./

In *Humberston* v. *Humberston*, 1 P. Wms. 332 (1716), a testator
" devised his estate  .   .   .   to the drapers-company and their
successors in trust to convey the premises to his godson Matthew
Humberston for life, and afterwards upon the death of the said
Matthew, to his first son for life, and so to the first son of that
first son for life, &c., and if no issue male of the first son, then to
the second son of the said Matthew Humberston for life, and so to
his first son, &c., and in failure of such issue of Matthew then to
another Matthew Humberston for life, and to his first son for life,
&c., with remainders over to very many of the Humberstons (I
think about fifty) for their lives successively, and their respective
sons, when born, for their lives, without giving an estate in tail to
any of them, or making any disposition of the fee.  .   .   .   By
Lord Chancellor [*Cowper*]: Though an attempt to make a per-
petuity for successive lives be vain, yet so far as is consistent with
the rules of law, it ought to be complied with; and therefore let
all the sons of these several Humberstons, that are already born,
take estates for their lives; but where the limitation is to the first
son unborn, there the limitation to such unborn son shall be in
tail male."

By " sons  .   .   .   already born," " it must be assumed that
the court intended sons born at the time of the testator's, death.
.   .   .   The distinctive character of the practice of courts of
equity, in carrying out executory trusts, is the giving effect to
them as far as possible according to the intentions of their author."
Lew. Perp. 450, 451.   In *Humberston* v. *Humberston*, " the trust
was executory : and in those cases the courts adopt the doctrine of
*cy pres*.   That mode of construction is inapplicable where  .   .   .
the devisees take by direct devise to themselves."   *Mortimer* v.
*West*, 2 Sim. 274, 282.   " The case of *Humberston* v. *Humberston*
.   .   .   has usually been considered as a leading authority for the
doctrine " of *cy pres*.   " The trust however being executory, the
court was authorized to mould the limitations so as to bring them
within the established limits, independently of the doctrine in
question."   1 Jarm. Wills (4th ed.) 298 *n.* (*i*).   When the con-

struction is *cy pres*, nothing is gained by giving it some other name. "In *Parfitt* v. *Hember*, L. R. 4 Eq. 443, where it was considered that the testator had intended to create a series of life estates in perpetuity, Lord *Romilly*, M. R., by *cy pres* gave the unborn issue an estate tail, declaring that the doctrine was not confined to executory trusts; and this declaration was approved in *Hampton* v. *Holman*, L. R. 5 Ch. D. 183, 190, 191." Gray Perp., s. 652. As *cy pres* is a construction that gives effect to approximations intended by the testator, it cannot depend upon a devise being direct or indirect.

"The most striking illustration . . . of the anxiety of the courts to prevent the total disappointment of the testator's intention by the operation of the rule against perpetuities, is afforded by the doctrine of *cy pres* or approximation (as it is called). This doctrine applies where lands are limited to an unborn person for life, with remainder to his first and other sons successively in tail, in which case, as such limitations are clearly incapable of taking effect in the manner intended, . . . the doctrine in question gives to the parent the estate tail that was designed for the issue; which estate tail (unless barred by the parent or his issue, being tenant in tail for the time being) will comprise, in its devolution by descent, all the persons intended to have been made tenants in tail by purchase. The intention that the testator's bounty shall flow to the issue, is considered as the main and paramount design, to which the mere mode of their taking is subordinate, and the latter is therefore sacrificed." 1 Jarm. Wills 260, 261. "Where a testator has two objects, one primary or general, and the other secondary or particular, which are incompatible, the particular intention must be sacrificed, in order that, as far as possible, effect may be given to the general one." Lew. Perp. 426.

In *Robinson* v. *Robinson*, 1 Burr. 38, 50–52 (1756), it was held "that upon the true construction of the said will, . . . the said Lancelot Hicks must, by necessary implication, to effectuate the manifest general intent of the said testator, be construed to take an estate in tail male, . . . notwithstanding the express estate devised to the said Lancelot Hicks, 'for his life and no longer.'" In *Dodson* v. *Grew*, 2 Wils. 322 (1767), the will was,— "I give, devise and bequeath unto my nephew George Grew all my lands . . . for and during the term of his natural life, and from and after his decease to the use of the issue male of his body lawfully to be begotten, and the heirs male of the body of such issue male; and for want of such issue male, then I give all and every the aforesaid premises unto my nephew George Dodson, his heirs and assigns forever." George Dodson was the plaintiff. George Grew entered and suffered a common recovery, and died without issue male. It was held that he took an estate tail, and consequently the plaintiff was barred by the recovery. "The statute of wills," says *Wilmot*, C. J., "gives a man power to devise his

lands, but he cannot by his will create a perpetuity, nor restrain tenant in tail from suffering a recovery. . . . The intention of the testator clearly was to give George Grew an estate for life only, but his intention also clearly was, that all the sons of George Grew should take in succession; both these intentions cannot take place. . . . The court must put themselves in the place of the testator, and determine as he would have done, if he had been told that both of his intentions . . . could not take place, and had been asked which of them he desired should take effect. . . . If we balance the two intentions, the weightiest is, that all the sons of George Grew should take in succession; and therefore . . . George Grew must be adjudged to have been tenant in tail, for the testator's great intention most clearly was that the lands should never go over to the . . . plaintiff but upon a failure of issue of George Grew." "The great intention," says *Clive*, J., "is to give in succession to all the sons of George Grew, which cannot be without . construing it an estate-tail in him." "Where there appears a particular intent, and a general intent, the general must take place." *Bathurst*, J., in the same case.

The doctrine of *cy pres* goes on the principle "that where there is a general and a particular intent, and the particular one cannot take effect, the words shall be so construed as to give effect to the general intent." *Robinson* v. *Hardcastle*, 2 D. & E. 241, 254 (1788). "It has been the settled doctrine of Westminster Hall for the last thirty or forty years that there may be a general and a particular intent in a will, and that the latter must give way when the former cannot otherwise be carried into effect. . . . Nothing could be more positive than the words of the will in" *Robinson* v. *Robinson* "to show a particular intent that the first taker should take an estate for his life *and no longer*. But there was a general intent apparent, which could not be effected but by giving him an estate-tail, and on that the decision was founded." *Doe* v. *Cooper*, 1 East 229, 234 (1801). "A particular intent expressed in a will must give way to a general intent. . . . It is not to be inferred that, because the heirs of the body cannot take in the particular mode prescribed by the testator, he intended that they should not take at all." *Doe* v. *Harvey*, 4 B. & C. 610, 620 (1825).

"There is certainly no express gift to" the sons of P. M. "as tenants in tail; but it is contended that in order to effectuate the testator's general or leading intention, they must be held so to take, according to what has been called the doctrine of approximation, or *cy pres*. . . . The doctrine of *cy pres*, in reference to questions of perpetuity, arises where a testator gives real estate to an unborn person for life, with remainder to the first and other sons of such person in tail-male, or with remainder to the first and other sons of such person in tail-general, with remainder to the daughters as tenants in common in tail, with cross remainders

amongst them.   In such a case, the course of succession designated
by the testator is one allowed by law, but the direction that the
first taker should take for life only, with remainder to his children
as purchasers, is illegal, as tending to a perpetuity.   In such cases
the law, in order to prevent the testator's intention from being
entirely defeated, has treated his expressed intention as divisible
into two parts : first, the intention that the first taker and his issue
male or issue general, as the case may be, shall all take in succes-
sion, according to the legal course of descent; and secondly, the
intention that the first taker shall take an estate for life only, and
that his children shall take as purchasers.   And the two inten-
tions being thus ascertained, the courts have treated them as inde-
pendent of each other, and have said that the inability to carry
into effect the second or subordinate intention shall not defeat the
primary or general intention; and such a devise has therefore
been held to give an estate in tail male or in tail, as the case may
be, to the first taker.   By these means, the estate . . . will
go in the precise course marked out by the testator, though it will
be (contrary to what he intended) liable to be divested from that
course by the act of the first taker. . . . The doctrine has
been long recognized, and we should be unsettling landmarks if
we were to call it in question.   The doctrine is nowhere more
clearly stated than in a note of the late Mr. Butler, at the end of
Fearne's chapter on the rule in *Shelley's Case*.   Fearne Cont. Rem.
204. . . . 'The courts have considered that the testator's pri-
mary object was that the issue of the devisee should take the land,
and that the mode in which the issue should take it was the tes-
tator's secondary object, or, as it has been usually expressed, that
the former was his general, the latter his particular, intention.
Then, in conformity to their uniform practice of effecting the tes-
tator's intention as far as possible, they have thought themselves
required to adopt that construction of the devise, which, by includ-
ing the devisee, satisfied the testator's general intention that the
issue should take, but which, at the same time, by raising in the
issue estates different from those which the testator appeared to
have intended them, sacrificed to that extent his particular inten-
tion.'"   *Monypenny* v. *Dering*, 16 M. & W. 418, 428, 429 (1847).

"That an estate for life in the plaintiff, according to the partic-
ular intent of the testator, contravenes no rule of law, is indispu-
table. . . . This construction, however, would defeat the tes-
tator's general intent, which was to create an interminable succes-
sion of estates in the premises. . . . To effectuate, therefore,
the general intent of the testator, it is necessary to vest in the
plaintiff a fee tail."   *Allyn* v. *Mather*, 9 Conn. 114, 127 (1832).
"If the intention cannot be carried into full effect, it is to be car-
ried as nearly into effect as the law will permit.   What the real
intention of the present testator was, with respect to the property
in question, appears to be clear.   He wished his son to enjoy it

during his life, and his grandson during his life, and so on forever. But this intention contravenes a legal principle, and cannot be carried into full effect. . . . As then the intention of the testator cannot be completely effectuated, it becomes necessary to consider what estate allowed by law will be nearest to that which he intended. And it is clear that an estate tail will better correspond with his views than an estate in fee simple. . . . An estate in tail male is clearly nearer to the intention of the testator than an estate in tail general. The testator designed that the property should go from eldest son to eldest son indefinitely, each eldest son having only a life estate. An estate in tail male, excluding females, would be more in conformity to such design than an estate in tail general, admitting females." *Daggett*, J., in the same case, *pp.* 129–131.

In *Jackson* v. *Brown*, 13 Wend. 437 (1835), a testator devised land to his son, S., for life, remainder to the first son of S. for life, remainder to the first and every other son of the eldest son of S. successively in tail male. "It is an established principle," say the court, "in the decision of questions arising under wills, that the intention of the testator shall be effectuated in so far as such intention is consistent with the rules of law. It is a principle of law that perpetuities shall not be permitted to exist—real estates shall not be so conveyed or devised as to be inalienable beyond a certain period, because such perpetuities tend to the inconvenience and prejudice of commerce and society. . . . The doctrine of approximation, or, as it is called, the *cy pres* doctrine, . . . has been adopted in cases where the testator clearly intended to give estates which were contrary to the rules of law; and in construing such devises, the courts' primary object was to give effect to the general intent of the testator, which was, that the issue of the devisee should take the land, and that the mode in which the issue should take was his secondary object, or his particular intent. In order, therefore, to effect the testator's intent as far as possible (*cy pres*), the courts adopt that construction of the devise which by including the issue of the devisee satisfied the testator's general intent that the issue should take; but which in part defeated his particular intent by giving to his issue estates different from those intended by the testator. . . . By raising the estate tail in S., we should defeat the general intent of the testator, to wit, that of continuing the estate in his descendants as long as the rules of law will permit. If the will gave S. an estate tail, our statute converted it into an estate in fee simple; but if S. took only an estate for life, then the perpetuity is carried one degree farther in the family of the testator. If the law will permit that to be done, then it is the duty of the court to do it, as more nearly effecting the intention of the testator. . . . The testator intended that the lessor [the eldest son of S.] should take as purchaser, and not as heir. This intention is consistent with the rules of law, and

should be carried into effect. It was also the testator's intention that the lessor should take an estate for life only. That intention is contrary to the rules of law, as tending to a perpetuity: that intention the court cannot effectuate. But to effectuate the general intent as far as possible, the lessor must take an estate of inheritance—a fee simple."

"When the particular intent cannot be executed, the general intent must direct the construction." *Hawley* v. *Northampton,* 8 Mass. 3, 37 (1811). "The general intention is to control any particular intention, . . . *ut res magis valeat quam pereat.*" *Malcolm* v. *Malcolm,* 3 Cush. 472, 477–479 (1849). "Where the general intent of the testator is clear, and it is impracticable to give effect to all the language of the instrument expressive of some particular or special intent, the latter must yield to the former. . . . This rule is now clearly established, both in the English and American courts." Redf. Wills 432, 433.

"The doctrine that the general intent must overrule the particular intent has been much, and we conceive justly, objected to of late, as being, as a general proposition, incorrect and vague, and likely to lead in its application to erroneous results. . . . In its origin, it was merely descriptive of the operation of the rule in *Shelley's Case;* and it has since been laid down in others, where technical words of limitation have been used, and other words showing the intention of the testator that the objects of his bounty should take in a different way from that which the law allows have been rejected; but in the latter cases, the more correct mode of stating the rule of construction is, that technical words, or words of known legal import, must have their legal effect, even though the testator uses inconsistent words, unless those inconsistent words are of such a nature as to make it perfectly clear that the testator did not mean to use the technical words in their proper sense. . . . This doctrine of general and particular intent ought to be carried no further than this; and thus explained, it should be applied to this and all other wills. Another undoubted rule of construction is, that every part of that which the testator meant by the words he has used should be carried into effect as far as the law will permit, but no further; and that no part should be rejected, except what the law makes it necessary to reject. . . . This construction makes the least sacrifice of the testator's declared intention; it preserves estates to all his grandchildren. . . . It is true that these grandchildren cannot take estates for life, as the testator intended, for the rule in *Shelley's Case* prevents it; nor the children of those children estates for life, . . . for the rule of law against perpetuities prevents that; but this is unavoidable, and no construction can carry into effect all the testator wished: . . . *Murthwaite* v. *Jenkinson,* 2 B. & C. 357, . . . is an example of the proper construction of the word 'issue,' which was considered as a word of limitation, embracing all the descend-

ants, and in which the inconsistent intent that all those descendants should take for life formed no reason why they should not take at all. . . . Thinking therefore that this mode of construing the will gives effect to the greater part of it, and, as far as the rules of law will permit, the whole, whilst that contended for on the part of the plaintiff strikes out altogether the devise to the grandchildren, our opinion is that the former ought to be preferred." *Doe* v. *Gallini*, 5 B. & Ad. 621, 640–645 (1833); 2 Jarm. Wills 484–489.

As a description of the operation of the rule in *Shelley's Case*, the doctrine of general intent is immaterial. A devise or bequest to A for life, and to his heirs, shows an intent not that A's life estate shall be enlarged by the gift to his heirs, but that A shall have a life estate, and his heirs the remainder. The principle of our common law, that finds the intent in competent evidence and not in rules of construction, upholds the intent notwithstanding the rule in *Shelley's Case*. *Sanborn* v. *Sanborn*, 62 N. H. 631. If the operation of that rule had not been prohibited by statute, it would not defeat the intention that a remainder should go to the heirs of a tenant for life. So far as the doctrine of general intent is a rule of approximation that makes the least sacrifice of a testator's declared intention concerning realty or personalty (or a mixed fund of realty and personalty), rejecting no more of his will than the law makes it necessary to reject, and preferring " the greater part," and the " weightiest" intent, when the greater and the less cannot both be carried into effect, it is as applicable in this and other cases as in those in which it has been applied.

By this curative process, a line of partition is drawn through a gift to a polygamous church, the donor's intent is executed so far as it is legal, and the whole gift is supported and applied to lawful uses. *Mormon Church* v. *U. S.*, 136 U. S. 1, 50, 55, 56. By the same process, a devisee's life estate is made an estate tail, and the time appointed by the testator for the vesting of title is changed, and brought within the period prescribed by law. Gray Perp., *ss.* 643–670. "A charity, being a trust in the support and execution of which the whole public is concerned, and which is therefore allowed by the law to be perpetual, deserves and often requires the exercise of a larger discretion by the court of chancery than a mere private trust; for without a large discretionary power, in carrying out the general intent of the donor, to vary the details of administration, and even the mode of application, many charities would fail." *Jackson* v. *Phillips*, 14 Allen 539, 580. Discretionary power is exercised by weighing evidence on a question of fact. 50 N. H. 120; 52 N. H. 408; 64 N. H. 186, 259; *ante, p.* 153. As a devise to members of the testator's family is more specific than an ordinary public charity, it may carry less latitude of approximation; but authorities before cited show that the margin is not narrow in all cases of private use. Barker did not intend that his

gift to his grandchildren should fail by being excepted from the method of construction that would save a bequest to the Mormon church. The approximation intended by testators is not limited to charitable uses and cases in which the time of vesting is changed by converting life estates into estates tail. Prohibiting a change of the time without such an alteration of a devised estate, would be arbitrary legislation. The time is changed by an intended approximation because the testator's disposition of his property is not invalidated beyond the bounds of necessity. The construction is *cy pres* because it is an ascertainment of his intent. Perry Trusts, *ss.* 723–729; *Adams Academy* v. *Adams*, 65 N. H. 225, 226; *Arnold* v. *Congreve*, 1 Russ. & M. 209, 215. If the whole of Barker's property had been New Hampshire land, and his will had been in the form of a devise of the whole in tail to his grandchildren living at his death, he would not have been intestate. His general and primary intent would have been that they should have the property; and as they could not take an estate tail, they would have a fee simple. *Jackson* v. *Brown*, 13 Wend. 437; *ante, p.* 469.

It has been said that "the doctrine of *cy pres* goes to the utmost verge of the law, . . . to the outside of the rules of construction" (1 East 451), and that "it is not proper to go one step farther." 7 Ves. 390, and authorities cited in Gray Perp., *ss.* 645, 651. In changing the character of devised estates for the purpose of changing the time of vesting, the authorities have gone farther than there is occasion to go in this case. "Such a construction is to be adopted as will make the devise effectual; and if it cannot be so to the full extent, then so far as it lawfully can." *Dennett* v. *Dennett*, 40 N. H. 498, 500. "The method of the courts is not to set aside the intent because it cannot take effect so fully as the testator desired; but to let it work as far as it can. . . . The very being of executory devises shows a strong inclination, both in the courts of law and equity, to support the testator's intent as far as possible." *Talbot*, Ld. Ch., in *Hopkins* v. *Hopkins*, Forrester (Eq. Cas. *temp.* Talbot) 44, 50 (1734). "The common law doth divide according to common reason, and having made that void that is against law, lets the rest stand." *Norton* v. *Simmes*, Hob. 12 c, 14; 4 Kent Com. 281 *n. a.* "It is . . . difficult at times to determine whether in the case of an executory devise to a class, when some cannot take because too remote, the whole devise is void as against perpetuity, or only that part which offends. The determination of the question depends upon the ability to separate the good from the bad, and at the same time preserve the intention of the testator." Tied. Real Prop., *s.* 544. This test is as applicable to other questions of approximation as to the divisibility of a class of devisees.

A division of a defective will is the execution of the testator's intent, inferred as a fact from competent evidence. When a contrary design does not appear, he intends that separable parts shall

be separated if one is illegal or otherwise incapable of execution. He could not desire that the whole should be unnecessarily and unreasonably set aside, that an effort should be made to save as little as possible, or that the dividing line should be drawn at random._ ]A total or disproportionate destruction of the will is not one of the objects he had in view in making it. The nature of the case is evidence of his intent that there shall be no useless mutilation, but that when enough of his plan is annulled to conform it to the law, it shall be left as nearly whole as consistency and reason will permit. The same evidence shows his meaning to be, that if all his arrangements, general and particular, primary and secondary, cannot be carried into effect, " the inability to carry into effect the secondary or subordinate intention shall not defeat the primary or general intention." If any of his orders cannot be executed in the designated time or manner, or to the designated extent, he means that the execution shall be approximate (as nearly as possible according to instructions) in time, manner, and extent. A bequest of $100, to be paid at the end of six years, does not mean that the legatee shall have nothing in case there is less than $100 for him, or in case the executor has no means of payment before the end of twelve years, or in case he has means of payment at the end of five years, and the law requires all legacies to be then paid notwithstanding the testator's appointment of a more remote time. Without other evidence, a mere devise of a farm, accompanied by a suspension of the title in trust for a time, does not indicate a purpose that the devisee is not to have the farm if the specified time is a day, a year, or twenty years longer than the legal period, and if no wrong would be done by an approximation. [Within the legal limit, the testator's power of suspending the title is not affected by the disability under which he labors beyond that limit. The devise is effective *cy pres*, in pursuance of his implied intent to divide according to common reason, throw out what is against law, and let the rest stand. This legal intent, correctly inferred as a fact, is a part of the will, not less operative or less important than it would be if set forth in express terms in the writing. ]A refusal to execute it would be an alteration of the will, and a violation of common-law principle and statutory right.

The legality of Barker's small bequests is not disputed. The will is not wholly void, but is admitted to be good in part, and to be divisible. The question is, not whether it shall be divided, but where the line of division shall be drawn. /In the devise of the remainder to the grandchildren, the last nineteen of the forty years are too remote. In the rest of the time, and the rest of the will, there is no illegality. The invalidity arising from remoteness would be unnecessarily and unreasonably extended by throwing out twenty-one years that are not too remote. The intestacy asserted by H. would be a more inordinate expansion of the lim-

ited defect. / " When a man sits down to dispose of his property by will, it is fair to presume that he does not intend to die intestate, nor to become intestate after death." *Weatherhead* v. *Stoddard,* 58 Vt. 623, 629; 63 N. H. 311, 499. " Where the will admits of two constructions, that is to be preferred which will render it valid. . . . Of two modes of construction, that is to be preferred which will prevent a total intestacy. . . . Where a testator's intention cannot operate to its full extent, it shall take effect as far as possible." 2 Jarm. Wills 842, 843. These so-called rules are a correct statement of Barker's intention. The third applies the first to the partial invalidity, and the second to the question of his alleged partial intestacy. Whether they are regarded as a statement of the fact of intention, or as rules of law adopted by him as a part of his will (18 Wend. 302–304), the result is the same. They would not have been strengthened by his recital of them. His declaration, inserted in the will, that " if my intention, herein written, cannot operate to its full extent, it shall take effect as far as possible," would have been superfluous. Such a provision, accepted by him as law, or found to be an expression of his implied intent, renders the will valid *cy pres.* The partial invalidity, neither increased nor diminished, introduces neither total nor partial intestacy. The construction that rejects the approximation intended by the testator, and makes him intestate as to a part of his property, is sustained by authorities in other jurisdictions, but is at variance with the effect given to intent by the law of this state. When the youngest of the grandchildren is twenty-one years of age, the remainder devised to them will be theirs.

A testator may prefer, in certain contingencies, to be wholly or partially intestate. In this will, Barker could have said, " If my intention, herein expressed, cannot operate to its full extent, it shall not take effect as far as possible. No part of my will shall be sustained by an inferred intent that it shall work as far as it can, or by the equivalent rule of construction. If the whole cannot take effect, the whole shall be void." It is not claimed that such a provision can be implied. He could have said, " If the vesting of the remainder in my grandchildren cannot be postponed beyond the time when the youngest is twenty-one, the devise thereof to them is revoked, and as to said remainder there shall be no will." His belief that the protection due from him to them was a will that would save the remainder for them, and his exhaustive effort to do his duty (explained and emphasized by a fact plainly disclosed), cannot be reconciled with an intent that the devise of the remainder shall be revoked, and that his confessed duty shall not be done, if the devisees' title cannot be suspended beyond the minority of the youngest. The revocation of that devise, leaving the remainder to descend as intestate property, would thwart the purpose of his conditional appropriation of $30,000 (by making H. the absolute owner of a large amount of

property), deprive the grandchildren of the protection which the testator considered indispensable, and defeat the main objects of the will. It would be little less erratic than a causeless revocation of the whole instrument. An intended intestacy as to the remainder can be inferred from nothing but mental disorder, of which there is no evidence.

It is said that in some cases "the court must put themselves in the place of the testator, and determine as he would have done if he had been told that both of his intentions in the will, by the rules of law, could not take place, and had been asked which of them he desired should take effect and stand, as both could not" (*Dodson* v. *Grew*, 2 Wils. 322, 323, *ante, p.* 467), and that the court inquire "what the testator would probably have done himself" (*Attorney General* v. *Ironmongers Co.*, 1 Cr. & Ph. 208, 224), and what he probably "would have preferred." 2 Beav. 313, 325. It is not said that this is the question in all cases when a testamentary provision cannot be executed. Upon incompetent evidence (circumstantial or direct) that if Barker had been aware of some matter of law or fact of which he was ignorant he would have made a different will, legal construction cannot do what he would have done. But this will is competent and sufficient evidence that if he had been informed (when he gave instructions for drafting it) that his intent that his grandchildren should have the remainder could not stand with his intent that they should not have it till the youngest was forty years old, and had been asked which of these intents should prevail, he would have given an answer that is comprehended in his intent on the subject of approximation. The law determines not what will he would have made if he had known that the last nineteen of the forty years were too remote, but what will he did make in ignorance of this flaw in his appointment of time. His intent that the grandchildren shall not have the remainder till the youngest arrives at the age of forty years is modified by his intent that they shall have it, and that the will shall take effect as far as possible. The forty years are reduced to twenty-one by his general approximating purpose, which is a part of the will.

*Decree for the trustees.*

Clark and Chase, JJ., did not sit: the others concurred.